1          IN THE UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF NEW MEXICO

3   UNITED STATES OF AMERICA,

4            Plaintiff,

5        vs.                CRIMINAL NO. CR-10-773 JB

6   JOHN LEONARD TSOSIE,

7            Defendant.

8        Transcript of Daubert Hearing before The Honorable

9   James O. Browning, United States District Judge, held in

10  Bernalillo County, Albuquerque, New Mexico, commencing on

11  Thursday, April 28, 2011, at 8:34 a.m. and concluding at

12  4:43 p.m.  Proceedings recorded by mechanical stenography;

13  transcript produced by computer-aided-transcription.

14  For the Government:
        UNITED STATES ATTORNEY'S OFFICE
15      District of New Mexico
        201 Third Street, Northwest, Suite 900
16      Albuquerque, New Mexico  87102
        BY:  MR. KYLE T. NAYBACK and
17           MR. MARK T. BAKER

18  For the Defendant:
        MR. SAMUEL L. WINDER
19      Law Office of Samuel L. Winder, LLC
        1011 Lomas Boulevard, Northwest
20      Albuquerque, New Mexico  87102

21

        Danna Schutte Everett, CRR, RPR, RMR, CCR 139
22             United States Court Reporter
              333 Lomas Boulevard, Northwest
23            Albuquerque, New Mexico  87102
                 Phone:  (505) 348-2283
24                Fax:  (505) 348-2285

25

1          THE COURT:  Good morning, everyone.  I appreciate

2 everyone being here bright and early and working with me on my

3 schedule here.  I really didn't find out until yesterday

4 morning and, as you know, it took a little bit of time to work

5 with you to see whether I could make some comments for a friend

6 at a funeral today.  So I appreciate everybody working with me

7 on my schedule.

8          All right.  The Court will call United States of

9 America versus John Leonard Tsosie, Criminal Matter 10-0773 JB.

10          Counsel will enter their appearances.

11          MR. NAYBACK:  For the United States, Your Honor, Kyle

12 Nayback.  With me at counsel table is the newest addition to

13 the Indian Country crimes section Mark T. Baker, Assistant U.S.

14 Attorney, graciously agreeing to assist me on this case and

15 playing a significant roll today.

16          Also seated at counsel table is Ms. Nancy Drez, a

17 forensic toxicologist formerly with the State of New Mexico,

18 will be the focus of the examination today.

19          THE COURT:  All right.  Mr. Nayback, good morning to

20 you.

21          Mr. Baker, good morning to you.

22          Ms. Drez, good morning to you.

23          All right.  For the defendant?

24          MR. WINDER:  Mr. Sam Winder on behalf of Mr. John

25 Leonard Tsosie, who is present in court.

1          THE COURT:  All right.  Mr. Winder, good morning to

2     you.

3          Mr. Tsosie, good morning to you.

4          All right.  One thing I noticed -- In reading all the

5     materials, I know some of them -- we're not going to reach

6     Dr. Reyes today, but I do a lot of stuff at the University of

7     New Mexico law school.  I don't do anything particularly at the

8     med school, but I do teach from time to time as adjunct

9     professor.

10          I usually turn back my pay and don't accept it, but I

11    do have a lot of externs and teach over there from time to

12    time.  If anybody has any questions, primarily with the law

13    school --

14          My son has some connections, with his theater, with

15    the theater department, but I don't think we really have any

16    connections with the law school -- with the medical school.

17          Also, I noticed that Dr. -- is it Krinsky, the

18    pathologist?

19          MR. NAYBACK:  Yes, Your Honor.

20          THE COURT:  She did testify here about two or three

21    weeks ago in a trial I had is, as a pathologist.  She may have

22    been pregnant at the time, so maybe she's not present because

23    of the pregnancy, but I noticed that she -- y'all indicated

24    that she wasn't available.

25          MR. NAYBACK:  No, I don't believe so.  I don't

1  believe Mr. Winder was challenging Dr. Krinsky's credentials or

2  her opinion.  She simply examined the decedent.  There's not

3  much way up there.  If Mr. Winder initially moved to challenge

4  her, maybe it wasn't withdrawn.

5          THE COURT:  It wasn't so much a challenge, but

6  somebody said that they thought that she had left the forensic

7  office over there.

8          MR. NAYBACK:  She's available and under subpoena for

9  June 20th, Your Honor.

10          THE COURT:  Okay.  All right.  I think we have a lot

11  of paper in this case.  I think it's Ms. Drez that's the topic

12  today.  Is that correct?

13          MR. NAYBACK:  It is correct, Your Honor.  If I could

14  take up just a couple of matters regarding her testimony?

15          THE COURT:  All right.

16          MR. NAYBACK:  First, let me start off that, thank you

17  for granting the joint motion.  The United States has all of

18  its witnesses under subpoena for June 20th, a firm trial

19  setting.  There's about 20 witnesses, Your Honor, and we

20  believe that we could -- the United States would be able to get

21  through its case-in-chief within three to four days, leaving

22  time for Mr. Winder to present a case if he so chose.

23          One outstanding matter we have is, while we're taking

24  care of Ms. Drez today, I did file a challenge to Dr. Reyes.

25  Mr. Winder filed his expert report just on April 21st, and as a

1  matter of courtesy we extended to Mr. Winder a chance to sit

2  down with Ms. Drez, and he indicated he would afford the same

3  courtesy to us.

4      So within the next couple weeks, hopefully -- I'm

5  working with Mr. Winder on this -- we will sit down with

6  Dr. Reyes.  We would like a day to get a transcription of that

7  meeting, and then we would request a small chunk of the Court's

8  time to examine Dr. Reyes.

9      I'm working with Ms. Wild as to potential dates, but,

10  hopefully, get it done before Memorial Day, but not butting up.

11      On that issue, Mr. Winder did indicate that he was

12  working Dr. Reyes, and we believe we're entitled to that first

13  informal meeting.  We will be providing briefing to the Court

14  as to why we believe Dr. Reyes's opinion should be excluded.

15      And the one other matter that Mr. Winder raised with

16  me this morning -- and I appreciate it -- is he filed a motion

17  in limine regarding the scope and admissibility of Ms. Drez's

18  proposed testimony, and we still believe we're -- we would like

19  to respond in writing, if possible.  We haven't done that yet.

20  And it would be a short response.

21      We believe that the single case cited by Mr. Winder

22  Jenita Chavez, is not on point, and he's really raising a

23  relevancy argument that we don't think the Court needs to take

24  up today prior to having Ms. Drez testify about the scientific

25  underpinnings of her opinion, which is really the purpose of

1  today's hearing, the Daubert hearing.

2          So I'd be happy to answer any questions the Court

3  has.

4          Again, Mr. Baker has graciously agreed to help me

5  with the case, and, in fact, enthusiastically wanted to handle

6  today's examination.  I have one other hearing that I might

7  need to be absent for, but I don't want to waste any more time.

8  I'll sit down.

9          My understanding is we get about an hour this

10 morning, and then we'll take it back up at 2:00 this afternoon

11 and go as long as necessary.

12          In speaking with Mr. Baker, who's well prepared, he

13 doesn't believe that Ms. Drez's direct examination would take

14 much more than an hour, Your Honor.

15          Thank you for your time.

16          THE COURT:  Okay.  Let me ask Mr. Winder.  What is

17 it -- As I listen to Ms. Drez, what is it -- I'm still not

18 quite certain what it is that you're concerned about in her

19 testimony.

20          MR. WINDER:  Your Honor, may it please the Court?

21          THE COURT:  Mr. Winder.

22          MR. WINDER:  Your Honor, we may disagree, but, Your

23 Honor -- Mr. Nayback and I -- but my reading of the law is that

24 retrograde extrapolation is not viable in state courts as a

25 result of a New Mexico statute.  And I don't have -- I wasn't

1  prepared to make my legal argument today, but that's my

2  understanding.

3          And given the law and my reading of the Chavez

4  case -- and I reviewed another case last evening that -- where

5  cert. was denied -- it seems to me that it's the opinion of the

6  New Mexico courts that retrograde extrapolation is not viable,

7  Your Honor.

8          THE COURT:  So your problem with Ms. Drez's testimony

9  is not that she didn't do these tests, right?  You're not

10  arguing that she is unqualified to give the opinion?  I'm sort

11  of setting something up here.  Your argument is that as a

12  matter of law it's just -- it's just legally inadmissible in

13  New Mexico State courts?

14          MR. WINDER:  My reading --

15          THE COURT:  Is that fair?

16          MR. WINDER:  That's my reading of the law.  And I

17  look forward to getting the analysis from the U.S. Attorney's

18  Office, Mr. Nayback.

19          THE COURT:  The legal analysis?

20          MR. WINDER:  The legal analysis.  But that's at least

21  my -- my research that's what my conclusion is.

22          THE COURT:  So if I allow -- If I say, well, from a

23  legal standpoint I think this analysis can come in, you don't

24  have any other problem with Ms. Drez?  You're just saying that

25  as a matter of law her entire analysis shouldn't come in?

1          MR. WINDER:  That's correct.  And I think -- At least

2    my reading of the law last evening is that there's a

3    presumption that that score .07 -- that was the score that was

4    obtained at the hospital -- that that is within three hours.

5    That's what the statute says, within three hours.  That is .07.

6          I spoke to my client, and I think we're prepared to

7    stipulate that his blood alcohol was .07.  I believe at least

8    the opinion that I read last evening is that that doesn't bar

9    the defense from raising issues with regard to that matter.

10          And I'll proffer to the Court that Dr. Reyes will

11   opine that the blood alcohol content was .066, Your Honor.  So

12   I believe that -- Maybe I'm reading the statute and the case

13   law incorrectly.  And again, I'll have a chance to reply.

14          THE COURT:  But again, you're not raising concerns

15   about Ms. Drez's methodology or the acceptance of that

16   methodology?  It's just that you believe New Mexico courts

17   exclude that?

18          MR. WINDER:  I'll attack her cross-examination.  I

19   believe there are assumptions that need to be made with regard

20   to retrograde extrapolation which --

21          THE COURT:  Well, you intend to cross-examine her and

22   expose, perhaps, weaknesses, but from a Daubert standpoint, you

23   don't have any problem with her methodology or -- well, of the

24   scientific acceptance of her testimony?

25          MR. WINDER:  I believe that's correct, Your Honor.

1    If I could just raise another issue.

2              THE COURT:  You may.

3              MR. WINDER:  Your Honor, we will put on a case, and

4    one of the persons -- I filed a notice with regard to David

5    Torres.  He was the United States expert.  I'll proffer to the

6    Court, he doesn't want to participate as an expert in our case,

7    so we'll subpoena him.  We hope the United States would assure

8    that he doesn't avoid a subpoena, because he'll be a fact

9    witness.  I believe under relevant case law that he can

10   testify.

11             He was retained as an expert by the United States,

12   and they know what the opinion states, and so we'll -- we're

13   prepared to subpoena him as a fact witness, Your Honor.  And I

14   hope the United States will work with us so that he doesn't

15   avoid that subpoena, Your Honor.

16             THE COURT:  All right.  Well, we'll come back to

17   Mr. Torres.  Y'all may want to search my database, and perhaps

18   I can do that while we're taking testimony this morning.  I've

19   written on this, when somebody has an expert -- and oftentimes

20   it is the defendant in civil cases and things like that -- that

21   has an expert and then they decide not to call him, the

22   limitations that the other side has in their ability to turn

23   that expert into their own expert without retaining and paying

24   for them.  So I have sort of written in this area.  I don't

25   know all the facts and circumstances here, but I do have a

1    little bit of law on that subject.

2            MR. WINDER:  Thank you, Your Honor.

3            THE COURT:  All right.  Thank you, Mr. Winder.

4            Mr. Baker, given that, how is -- I'm not trying to

5    avoid taking testimony this morning, but how does -- how does

6    what Ms. Drez is going to say, as far as methodology and those

7    things, going to help the Court with the legal issue?

8            MR. BAKER:  Your Honor, given what Mr. Winder has

9    said this morning, I don't think that it's necessary to have

10   Ms. Drez testify.  The purpose of calling her today would have

11   been to establish that she satisfied the requirements of Rule

12   702.  If the sole question is this legal issue of relevance,

13   that's something to be resolved on the briefing, and we feel

14   confident that the New Mexico Supreme Court still expects

15   retrograde extrapolation in DUI cases under appropriate

16   circumstances, such as those here.

17           And so we can address that in our response brief, but

18   I don't see the purpose, if there's not going to be a challenge

19   to her admissibility, if Mr. Winder's just going to

20   cross-examine her at trial and we don't need to have her on the

21   stand this morning.

22           THE COURT:  Your thoughts, Mr. Winder?

23           MR. WINDER:  Your Honor, I think that we still need

24   to.  Let me address one of the issues with regard to -- I'll

25   proffer to the Court one of the issues with regard to -- is the

blood sample.  We found out on March 23rd, which Ms. Drez did

not know until March 23rd that the blood draw was at 6:15 in

the morning.  And I'm prepared -- I'll proffer to the Court to

cross-examine with regard to the procedures that were --

that -- at the Fort Defiance Indian hospital.

I will still attack the credibility of the test.  So

I don't think that we -- We don't want to suggest that we don't

need a hearing, because those are critical issues, Your Honor,

with --

THE COURT:  But are they Daubert issues?

MR. WINDER:  They're not --

THE COURT:  They seem to me -- The 6:15 in the

morning time seemed to me to be a fact issue, and your concern

was that, well, she arrived at all these opinions and didn't

know what time it was, and then later found out about the time,

and you want to go into that.  But it didn't strike me as a

Daubert issue.  Your thoughts on that?

MR. WINDER:  I'll have to think about that, Your

Honor, but I think Your Honor is correct.  So --

THE COURT:  Well, let's do this.  Let me leave it

this way.  He's raised a Daubert challenge.  I'm not quite

certain that I hear a Daubert challenge to that.  You're the

proponent of the witness.  I'll leave you in control.  If you

want me to hear any of this testimony this morning, if you

think I can -- if you want me to hear any of it, I'll listen to

1   it as part of trying to resolve Mr. Winder's challenge, be it

2   legal or be there anything left on it as far as Daubert.

3          If on the other hand you don't think it's necessary

4   and you don't want me to hear Ms. Drez, then you're kind of in

5   charge of that.  It's your witness.

6          MR. BAKER:  Okay, Your Honor.  Let me just confer

7   with Mr. Nayback briefly.

8          THE COURT:  Sure.  I think that's the way it is with

9   everybody.  The proponent of the witness I think is pretty much

10  in control, whether they want to put their witness on,

11  otherwise --

12         MR. WINDER:  After he's conferred, may I have a

13  moment?

14         THE COURT:  Do you want to hear Mr. Baker?

15         MR. WINDER:  Let me just raise an issue.  He may want

16  to talk to Mr. Nayback.

17         If I'm correct -- I don't have the notice of intent

18  in front of me, but I believe there was indications that there

19  would be -- hypothetical questions would be asked.  Well, if

20  that's true, I would like to know what those hypothetical

21  questions would be, because I think those hypothetical

22  questions may be tied to whatever testimony Ms. Drez will

23  present at trial.

24         So if I could have an idea as to what those

25  hypothetical questions would be, I know that those were raised

on March 23rd, but the interview -- much of the interview was focused on this new fact -- it wasn't a new fact -- at least it was something that Ms. Drez was not aware of on July 1st when she developed her first report. So I think it would be helpful to get an idea as to what the hypothetical questions that the United States intends to ask Ms. Drez at trial, Your Honor.

THE COURT: Well, the -- Now, I haven't mastered Ms. Drez's actual summary of opinions, but at least in the notice of intent I didn't see as to Ms. Drez hypothetical questions. Do you intend to ask any hypothetical questions of Ms. Drez?

MR. BAKER: Your Honor, they only would be to illustrate the opinions that she's -- that she's articulated.

Your Honor, I don't think, given Mr. Winder's statements this morning, that we actually -- that there's an articulated reason to have -- to have Ms. Drez on the stand, but I really don't want to end up at trial in a circumstance where in the middle of a day there's suddenly the need to, outside the presence of the jury, go through this exercise that we'd be doing this morning.

And so I think that to err on the side of caution my preference would be to go ahead and call Ms. Drez. It's a little difficult for me because I can't see that there's been an articulated challenge, but I don't want it to come up mid-trial and have the jury sitting outside waiting for us to

1    resolve it at that point.

2            THE COURT:  All right.  Ms. Drez, if you'll come up

3    and stand next to the witness box before you're seated,

4    Ms. Wild, the courtroom deputy will swear you in.

5        (Witness sworn.)

6            MS. WILD:  Please be seated.  State your name for the

7    record.

8            THE WITNESS:  Nancy Drez.  Drez is D-R-E-Z.

9            THE COURT:  Ms. Drez.  Mr. Baker.

10                NANCY DREZ, GOVERNMENT WITNESS,

11        after having been first duly sworn under oath,

12        was questioned and testified as follows:

13                    DIRECT EXAMINATION

14   BY MR. BAKER:

15   Q.   Good morning, Ms. Drez.  Would you please tell the Court

16   your current occupation?

17   A.   I'm currently retired from the Department of Health

18   Scientific Laboratory Division, and on a part-time basis I am

19   doing some consulting on DWI cases.

20   Q.   What was your job before you started your consulting

21   practice, specifically your title when you retired from the

22   Department of Health?

23   A.   I was at the lab for 21 years, but my -- the last position

24   before I retired was as breath alcohol supervisor.

25            MR. BAKER:  Your Honor, do you have the exhibit

1   binder in front of you?

2           THE COURT:  Yes.

3           MR. BAKER:  I don't know your preference in these

4   types of hearings in terms of the handling of exhibits.  I was

5   leaning towards working through them and just using like her

6   curriculum vitae as a shorthand to get through some of the

7   experience part and the challenge from Mr. Winder since this

8   all goes forward under Rule 104.  We don't have the rules of

9   evidence applicable.

10          Is that acceptable to the Court?

11          THE COURT:  It is.  Is that all right with you,

12  Mr. Winder?

13          MR. WINDER:  That's fine, Your Honor.  We don't

14  object to her expertise.  There is no objection.

15  Q.  (By Mr. Baker)  Would you turn to Exhibit D-3, Ms. Drez.

16  A.  Thank you.

17  Q.  Is that a current copy of your curriculum vitae?

18  A.  That's the most recent, correct.

19  Q.  If you would just give the Court a summary of the work and

20  responsibilities during your tenure at the Department of

21  Health.

22  A.  For the entire --

23  Q.  Yes.

24  A.  -- period?

25  Q.  Just a snapshot of the types of things that you did that

1  would be relevant to this case.

2  A.    Well, I was in the toxicology bureau of the scientific lab

3  for 21 years.  Before I retired, I was the breath alcohol

4  supervisor, and that entailed supervising all the criteria and

5  certifications needed for breath-alcohol testing for implied

6  consent, which would include the regulations, training about

7  3,000 officers to do breath-operator tests in the field,

8  training 300 key operators to maintain the instruments in the

9  field, periodically holding instructor classes -- 40-hour

10  instructor classes for qualified individuals to teach in the

11  field officers that had sufficient education for the

12  requirements.

13        And as part of me certifying the instruments, we did

14  inspections, we prepared the solutions that are used to check

15  the calibration.  I was often required to go to court to

16  testify as to how the instrument works, its reliability, and in

17  conjunction with the breath-alcohol case, I was also called

18  upon to discuss impairment at different blood -- breath-alcohol

19  levels, and on occasion retrograde extrapolation, particularly

20  in the period from about 2005 till present.

21  Q.    How many total years of experience do you have analyzing

22  blood-alcohol content either directly or as a supervisor?

23  A.    In the previous 19 years, I was directly involved with

24  analyzing blood and other tissues for the medical examiner and

25  for law enforcement under implied consent.

1    For about five years when I first entered, I was an
2  analyst and actually analyzed the samples for blood, implied
3  consent, and that also towards -- after about three or four
4  years I began to start doing expert -- besides the strictly
5  analyst testimony, doing expert testimony after completing
6  training and experience on impairment.

7    In my supervisor capacity for about ten years -- had
8  two blocks of supervisor experience.  Then I was responsible
9  for the breath and the blood-alcohol programs.  And in addition
10 to what I've already talked about with the breath program, in
11 the blood-alcohol program I was reviewing all the cases from --
12 that came through the medical investigator, which includes the
13 fact that all cases, but in particular all fatal -- fatalities,
14 toxicology samples are sent -- fatality in driving, traffic
15 fatalities -- That's the word.  They were -- Toxicology blood
16 and vitreous samples were sent to the lab to be tested to check
17 for the BAC, and that included reviewing the cases.

18   When we do an analysis, we also received the
19 circumstances, just, for instance, with the law enforcement,
20 you get a police report, we would get the pathologist's report
21 and the conditions preceded the fatality.  They were driving,
22 how they were driving, et cetera.

23   And I also reviewed the implied-consent cases.  And
24 these were the ones that were sent in by law enforcement, and
25 we did the analysis.  If we were required to go to court, then

1  we would also retrieve the police report and other

2  circumstances for the arrest to prepare us for any testimony

3  that we would need besides the analysis, as far as retrograde

4  extrapolation, whether the impairment matched the BAC and

5  other -- the other issues that are connected to the actual

6  blood or breath-alcohol level.

7  Q.   During your time at the Department of Health, did you

8  review the same types of documents you were provided by the

9  United States Attorney's Office in this case?

10  A.   Correct.  Very similar.

11  Q.   And in reviewing those documents and reaching your

12  opinions in this case, did you use the same rigor that you used

13  in reaching conclusions at the Department of Health?

14  A.   Right.  I used the same consideration of the facts in

15  deciding if retrograde analysis was possible and to what extent

16  the range and reliability.

17  Q.   And also with regard to impairment?

18  A.   And also with regard to impairment, yes.

19  Q.   On the second page of Exhibit D-3 there's -- there are two

20  professional organizations that are listed, the American

21  Academy of Forensic Sciences, and the Society of Forensic

22  Toxicologists.  Would you just briefly describe those for the

23  Court, and state what requirements a person must meet to join

24  those organizations?

25  A.   The American Academy of Forensic Science actually

1   encompasses the whole rainbow of forensics.  They have

2   criminology, question documents, ballistics.  All the different

3   specialties each has a separate section.

4           Under the toxicology section, you -- to be a member,

5   you have to be recommended by two current members or fellows

6   and you have to have an education and -- requirements and

7   experience requirements.

8           And for the SOFT, or the Society of Forensic

9   Toxicologists, that's strictly limited to toxicologists.

10  That's their organization.

11          To be a member of the forensic toxicologists -- For

12  instance, I had a bachelor's degree.  I needed to have six

13  years of experience previous to application, and I also had to

14  be sponsored -- or recommended by two full members of the

15  organization.

16  Q.   In total, how many times have you been certified to

17  testify in court as an expert in alcohol impairment and

18  blood-alcohol content?

19  A.   In the past -- I'd say for about 15 years were involved in

20  testimony and that would be at least twice a month testimony.

21  So 12, 24 -- so about 200 -- over 200 times.

22  Q.   To your knowledge, have you ever been excluded by a Court,

23  told that you couldn't testify following a hearing like this

24  where your opinions were evaluated?

25  A.   Actually, this would be my first Daubert hearing.  There

1   have been, as you say, voir dires for the trials, and -- Okay.

2   My memory, I can't remember ever being excluded.

3   Q.   How did you come to be involved in this case?

4   A.   I was contacted.  I was -- At the time, I was still

5   employed by the Scientific Laboratory Division, Department of

6   Health, and I was contacted by Mr. Nayback, that he had had

7   some cases that -- essentially, there were several cases about

8   that time that needed an expert witness, and we -- the lab

9   allowed me to pursue this case.

10  Q.   Have you done work for the U.S. Attorney's Office before?

11  A.   Yes.

12  Q.   You're compensated when you do work for the U.S.

13  Attorney's Office, correct?

14  A.   Correct.  The laboratory was compensated, yes.

15  Q.   Does the fact that you're compensated in any way affect

16  the way you go about your work?

17  A.   No.

18  Q.   Do you recall the case of Waylon Jim?

19  A.   Yes, I do.

20  Q.   Is that a case in federal court?

21  A.   Yes.

22  Q.   Were you admitted -- Were you allowed to offer opinion

23  testimony in that case?

24  A.   Yes, I was.

25  Q.   And that was in United States district court here in

1  New Mexico?

2  A.  Yes, it was.

3  MR. BAKER:  Your Honor, I'd move to have the Court

4  recognize Nancy Drez as an expert forensic toxicologist

5  permitted to offer opinion testimony related to extrapolation

6  of blood-alcohol content and alcohol impairment?

7  THE COURT:  Any objection?

8  MR. WINDER:  No, Your Honor.

9  THE COURT:  All right.  Ms. Drez will be allowed to

10  offer opinion testimony in the area of forensic toxicology.

11  Q.  (By Mr. Baker)  I'd like to shift gears and talk about the

12  facts that you considered to reach your opinions in this case.

13  Generally, what information did you review about the deaths of

14  Manuel Johnson and Loretta Johnson?

15  A.  I did not, other than the fact that they were the two

16  individuals -- I did not -- I looked at the police report.  As

17  far as their medical reports, I just scanned them.

18  Q.  Let me ask the question differently.  I wasn't asking

19  about the specifics of their medical condition.  But this case.

20  What information did you review regarding the crash at issue in

21  this case?

22  A.  For the case?  I looked at -- It was important to look and

23  see -- get an idea of the time of the crash, so I scanned the

24  dispatch reports, the police reports to get the time of the

25  test.  I looked at the hospital records of Mr. Tsosie, looking

1  for any test results, notation of any medical notes of

2  impairment or notice, anything that would indicate alcohol

3  involvement.  The police reports.  And, basically, I think that

4  was the -- the police reports, including dispatch reports, and

5  the medical reports.

6  Q.  Were you given documents that were Bates numbered 1

7  through nine-hundred-and-something?

8  A.  Right.  The first -- The disk I received was to like 996.

9  Q.  Did you have an opportunity to speak to the nurse who drew

10  Mr. Tsosie's blood following the crash at issue in this case?

11  A.  In March.  At the time that we had the meeting with

12  defense counsel, I believe shortly before that I had a

13  discussion with Ms. Bias.  I called her and I -- I had -- at

14  that time I had a copy of the notes, and I asked her when the

15  blood sample was taken.

16          The discussion during the interview with Mr. Nayback

17  and Mr. Winder, that was brought up as 6:15 as the time of the

18  test.  And then I spoke to Ms. Bias directly and established

19  from her that she said, "Yes, 6:15 was when the heplock was put

20  in.  That's when I would have done the blood."

21  Q.  Would you look at Exhibit D-5 in the binder in front of

22  you, please.

23          And when you refer to the heplock being inserted, is

24  that the first entry in this document?

25  A.  Yes, it is.

1    Q.    6:15 heplock 18 gauge in LAC?

2    A.    Correct.

3    Q.    Were you able to determine when the defendant says he

4    stopped drinking the night before the crash at issue in the

5    case?

6    A.    In the police report, it said that he had stopped drinking

7    at 11:00.

8    Q.    Would you turn to Exhibit D-4 in the binder?

9             Is this the document you're referring to?

10   A.    I believe so.  There was a summary.  Yes.

11   Q.    Would you look at the third -- fourth paragraph on the

12   document --

13   A.    Correct.

14   Q.    -- the second sentence, and just read that, please.

15   "Tsosie also indicated ..."

16   A.    "indicated he consumed three drafts last at 11:00 p.m. and

17   was very tired.  Then pulled off at a cousin's and then fell

18   asleep at the wheel."

19   Q.    Were you able to determine Mr. Tsosie's blood-alcohol

20   content based on the results of the blood test Ms. Bias had

21   taken?

22   A.    Yes.

23   Q.    And would you look at Exhibit D-7, please, on the second

24   page.

25             Is that a copy of the lab results?

1    A.    Yes.    That's one copy.

2    Q.    And would you point to the Court where the alcohol test

3    results are shown?

4    A.    The alcohol tests is in the bottom -- at the very bottom

5    of the printed matter, where it says, "alcohol high 84

6    milligrams per deciliter."

7    Q.    "84 milligrams per deciliter."    That's not the scale

8    that's used in New Mexico with regard to DUI; is that correct?

9    A.    Correct.    There's two differences.    This is a serum

10   alcohol, so that it has to be -- it's a little bit higher

11   numerically than a blood sample, because the blood cells have

12   been spun out of it.    So if you take a given volume of the

13   serum, as opposed to a given volume of the blood, if you have

14   blood cells in there you have sort of a dilution factor.

15            So there's a conversion factor of about 1.14 -- some

16   sources say 1.14, some say 1.16, but, essentially, it would be

17   equivalent to a .07 BAC.

18   Q.    And is the equation you used to reach the conclusion that

19   it's a .07, is that generally accepted in the toxicology

20   community?

21   A.    Yes, it is.

22   Q.    What is the limit for per se intoxication under New Mexico

23   law?

24   A.    For regular drivers, it's --

25            MR. WINDER:    Objection, Your Honor.    Relevance, Your

1  Honor.

2        THE COURT:  Well, let me hear it.  I'm going to have

3  to sort this relevance issue out, but I will hear the

4  testimony.

5  A.    For drivers, it's illegal to drive with a blood or

6  breath-alcohol content of .08 within three hours.

7  Q. (By Mr. Baker)  Were you able to determine the approximate

8  time of the accident in this case?

9  A.    The police dispatch report said -- indicated that it was

10 called in at 5:11, so I make the assumption that the accident

11 was very close to that.  At that time or immediately prior to

12 that time.

13 Q.    Do you feel comfortable concluding that it didn't happen

14 after 5:11?

15        MR. WINDER:  Objection.  Speculation, Your Honor.

16        THE COURT:  Well, these are just her assumptions.

17 You'll be able to cross-examine.  Overruled.

18 A.    Yes.  And I think in the police report it mentioned 5:11,

19 too.  So it was in a couple of places.

20 Q. (By Mr. Baker)  Would you look at Exhibit D-8 in front of

21 you, the second paragraph?

22 A.    Correct.

23 Q.    Is that a document that provided you the information

24 regarding the time of the crash?

25 A.    That was one of the documents, and also I did have a

1  printout of the -- everything that happened through dispatch.

2  Q.   Did you review the statements the defendant made to

3  medical personnel about when and how the accident happened?

4  A.   Yes, I did.

5  Q.   Would you turn to Exhibit D-6 in the binder?

6       Do you recognize this document?

7  A.   Yes, I do.

8  Q.   Is it Ms. Bias that provided you the information asked

9  about?

10  A.   Yes, it did.

11  Q.   Would you look to the middle of the page under "Basic

12  Data"?  Would you state what it says there?

13  A.   It asked when the injury occurred, and it indicates an

14  hour ago.  It said, "Recent alcohol use?"  It said, "Yes."  And

15  then it said, "How did the injury occur?"  "Patient states he

16  fell asleep at the" -- I guess that should be "wheel

17  driving" -- oh, "he fell asleep at the wheel while driving,

18  reportedly striking another vehicle head-on."

19  Q.   Based on the information we've gone through in this

20  binder, were you able to form an opinion regarding the range

21  within which the defendant's blood alcohol would have been at

22  the time of the crash?

23  A.   Yes.

24  Q.   And were you -- Based on this information, were you able

25  to form an opinion regarding the defendant's blood-alcohol

1   content earlier the night before the crash, the hours

2   preceding?

3   A.   Yes.

4   Q.   Were you able to form an opinion regarding whether the

5   defendant was impaired at the time of the crash?

6   A.   Yes.

7   Q.   Before getting to the specifics of your opinions, I want

8   to talk a little bit about the science behind determining

9   blood-alcohol content.   Would you just describe for the Court

10  generally how the body processes and eliminates alcohol?

11  A.   Once the alcohol goes into the stomach, it could be held

12  in the stomach for a certain period of time.   Depending on

13  whether there's food, what kind of beverages, different

14  circumstances.   Then the alcohol proceeds into the small

15  intestines.   Once the alcohol leaves the stomach and enters the

16  small intestines absorption begins immediately.   In fact,

17  absorption is usually done within the first 18 to 20 inches of

18  the small intestines.

19       At that point it goes into the circulation and goes

20  through the portal vein up into the -- throughout the body, and

21  as the alcohol starts to circulate through the circulatory

22  system, as it reaches the liver, it's metabolized.   And most of

23  the alcohol is eliminated by metabolism in the liver.   There's

24  some -- some metabolism in the stomach, but that's negligible

25  and would occur before it actually enters the small intestines.

1        But once it's circulating in the body, the liver

2    starts to metabolize the alcohol at about -- the most common

3    range for your average social drinker is from about a .01 BAC

4    to a .02 BAC.  That becomes especially relevant when the

5    individual has absorbed all the alcohol and it's been able to

6    spread throughout the whole body, because it does go into the

7    tissues and other parts of the body that have water.

8        At that point, we're strictly at an elimination

9    phase.  And this is the point where, if you're looking at

10   retrograde extrapolation, once absorption is complete and the

11   sole process that's kind of going along is that alcohol's being

12   eliminated.  Then you can look at a linear decline of about

13   .012 to .02 BAC during that interval.

14   Q.   What happens if someone -- to elimination rate if someone

15   is a heavy drinker?

16   A.   If that's the case, there are additional systems that can

17   kick in, some other enzymes that will start to do alcohol

18   metabolism, and they believe that's part of the reason that

19   people that drink alcohol regularly, alcoholics, have a higher

20   metabolism rate.

21   Q.   They eliminate faster?

22   A.   They eliminate faster, correct.

23   Q.   What do studies show that elimination rate can increase

24   to?

25   A.   Well, in one study Dr. Jones did, the one that I was

1    looking at when I formed my opinion, he looked at actual -- a

2    thousand drivers that were actually stopped for DWI, and he

3    found a range from a .01 up to almost a .030.  And there have

4    been studies in treatment facilities where they have monitored

5    and have found BAC metabolism in excess of that rate.  But

6    that's kind of -- I wouldn't consider that in looking at your

7    average driver pulled over for DWI.

8    Q.   Would you look at Exhibit D-1-A in the binder in front of

9    you?

10        Is that the Jones study you were referring to?

11   A.   Right.

12   Q.   Do you recall what that study found with regard to the

13   number of people who eliminated slower than .01?

14   A.   Well, he was looking at the influence of age and gender to

15   see how comfortable we can be with metabolism range.  And, as I

16   said, he -- because they were pulled over for DWI, he assumed

17   the population may be more frequent drinkers than social.  And

18   he found that 95 percent of the samples, the limit of agreement

19   of 95 percent of the samples, in other words, 95 percent of the

20   people who were tested, their elimination rate or rate of

21   metabolism ranged from a .09 to a .29 milligrams per

22   milliliter.

23        To put that in our units of grams per hundred mills,

24   then that would be from a .009, or round it up to two decimal

25   places, .01, to .029, which would be to two decimal points, a

1    .03.

2    Q.    Now, would you turn to page 981 of that exhibit, please?

3    A.    Okay.

4    Q.    On the upper right-hand corner, the first couple lines

5    discuss the people -- the 2.2 percent of people that had an

6    elimination rate below .01; is that correct?

7    A.    Correct.  It's a beta slope.  And beta is your rate of

8    metabolism.  And it's based on the steepness of the slope.  The

9    steeper the -- You know, the steeper the slope, the higher the

10   rate.  The beta slope was less than 0.10 milligrams per

11   milliliter for 24 individuals, or 2.2 percent.

12          So that would be -- again in our units, that would be

13   .01 grams per hundred mills.

14   Q.    And then the next couple sentences, the authors talked

15   about why they thought they might have seen 2.2 percent below a

16   .01?

17   A.    Correct.

18   Q.    Can you just summarize for the Court what they found?

19   A.    Okay.  What he was saying is that because this wasn't a

20   controlled laboratory study, where they knew exactly when

21   people started drinking and when they stopped and what they

22   were drinking, they were just taking two samples at a fairly

23   prolonged -- I think it was like about 60 minutes; I'd have to

24   look at it -- but he was taking two samples and with an unknown

25   history, and his conclusion that was probably those individuals

1  may have -- weren't in the elimination phase.  They were either

2  at a peak, where, for instance, if somebody does have a lot of

3  food and alcohol, their max -- they reach their maximum BAC at

4  about that same time as somebody that has been drinking.  But

5  they'll maintain that peak BAC for a longer period of time.

6  It's called a plateau.

7  Q.   Have you ever seen a study where anyone other than an

8  outlier was found to have an elimination rate below a .01?

9  A.   It's always been at the fringe of the Gaussian curve, the

10 bell-shaped curve.  It's almost like in the fringe of the

11 bell-shaped curve.

12 Q.   In this study in D-1-A -- Exhibit D-1-A, the Jones study,

13 can you turn to the first page and tell the Court what the mean

14 elimination rate that the study found?

15 A.   Okay.  The average was -- And he does give the standard

16 deviation.  So it was in our units of milligrams per hundred

17 mills, you do the calculations, it would be a .019 plus or

18 minus .005.

19 Q.   With regard to absorption, what does the literature say

20 regarding how long it takes for a person to complete the

21 absorption phase and move strictly into an elimination phase?

22 A.   Well, in most studies, and particularly -- I mean, I did

23 include one study.  But most studies agree the good average --

24 I wouldn't say the average.  The average is much less, but

25 there are always a significantly -- statistically

1   significant -- statistically significant people that may be

2   absorbing up to two hours.  After two hours, then we are

3   talking about something that's very rare.  So a very liberal,

4   most absorption is done within 30 minutes to an hour, but to be

5   very conservative, two hours would be your allotted time for

6   absorption of alcohol once drinking stopped.

7   Q.    Is elimination occurring while absorption is still going

8   on?

9   A.    Correct.  As soon as the alcohol starts circulating and

10  going through the liver, the liver is going to be metabolizing.

11  Q.    Would you turn to Exhibit D-1-E in the binder.

12        Is this one of the studies you reviewed that

13  addressed absorption rates and when a person moves into

14  strictly elimination phase?

15  A.    Correct.  And this study was looking at social drinking as

16  opposed to a laboratory experiment, where they come in and they

17  haven't eaten for a long time and they gave them a forced

18  amount of alcohol on an empty stomach.  This was looking at --

19  trying to look at circumstances that were more like real life,

20  circumstances where somebody had been drinking in the evening

21  at a party or a dinner or something and then track their

22  elimination rate.

23        MR. BAKER:  Your Honor, do you mind if I ask how

24  we're doing on time?

25        THE COURT:  We're about 22 after.  How much longer do

1   you want to go?

2           MR. BAKER:  Whatever works with your schedule.

3           THE COURT:  Let's go a little bit longer.  I

4   appreciate it.

5           MR. BAKER:  Okay.

6   Q.  (By Mr. Baker)  I want to shift gears now and talk about

7   the literature regarding the impairment effects of alcohol.

8   A.    Right.

9   Q.    Would you look at Exhibit D-1-B, please.

10  A.    I have it.

11  Q.    Is this one of the studies that you considered where they

12  looked at impairment effects of alcohol?

13  A.    Correct.

14  Q.    And could you just give the Court a snapshot, a summary of

15  the findings of the study?

16  A.    This study addressed the effects of -- the combined

17  effects of sleep deprivation and low-dose driving -- low-dose

18  alcohol and driving.  And the main effects that I saw in this

19  case was, one, it -- the main impairment that was noticed with

20  the drinking drivers was the problems with steering and

21  steering deviation; and, also, they monitored for subjective --

22  the subjects themselves asking, "Are you sleepy or not?" versus

23  objective measurements, where they -- the head electrodes to

24  check the brain waves and motion, and they found that the

25  drivers that had alcohol, which was still at relatively low

1  doses, about a .03, their perception of their impairment was

2  incorrect.

3  Q.   Would you look at page 1331 of that study?

4  A.   Okay.

5  Q.   Would you read aloud the -- this is page 1331 -- the first

6  two sentences that start with "The ability"?

7  A.   Correct.  "The ability to keep the car in the middle of

8  the lane is critical to safe driving and is one of the more

9  sensitive measures of driving impairment.  Although steering

10  deviation was not significantly affected by sleep restriction

11  alone, alcohol at BAC's as low as .025 grams per deciliter" --

12  that would be the same as grams per hundred mills -- "In

13  combination with sleep" -- half the Australian legal limit.

14  "In combination with sleep, restriction was sufficient to

15  significantly impair steering ability."

16  Q.   Now, would you turn to Exhibit D-1-C, the next exhibit?

17  A.   Okay.

18  Q.   Is this another study that you considered?

19  A.   Correct.

20  Q.   And would you just give the Court a snapshot of the

21  findings from this study?

22  A.   The findings from this study were very, very similar to

23  the previous study in which the drivers' perception of their

24  impairment was impaired and there was marked deviation in their

25  steering ability.

1 Q.   Now, moving through the exhibits, D-1-D.

2 A.   Okay.

3 Q.   Did you consider this study, as well?

4 A.   Correct.  In reviewing the NHTSA study on driving and

5 alcohol, there was mention of the effect of alcohol and

6 drowsiness, so I researched this separate document that was

7 done by a panel of experts from -- on sleep disorders and NHTSA

8 panel, and they also found that alcohol was important -- was a

9 significant risk to drowsy driving.

10 Q.   NHTSA is National Highway Traffic Safety Administration?

11 A.   Right.  Right.

12 Q.   Is that a federal governmental entity?

13 A.   Correct.

14 Q.   Now, finally, Exhibit D-1-F.  And I don't want to call

15 this a study, but it's more of a study of the studies, right?

16 A.   It's a review of studies, correct.

17 Q.   And what of significance did you find upon reviewing this

18 document?

19 A.   This document concluded, looking at the studies, that

20 there was significant impairment at lower blood-alcohol

21 content, that by .08 everyone had significant impairment, that

22 steering impairment would be down at -- what they did is they

23 looked at the studies and they looked at -- at all the studies,

24 the lowest BAC they would see for a particular function, like

25 steering, divided attention.  Then they looked to see how

1    many -- when the results for impairment at certain BAC levels

2    were found by over 50 percent of the studies.  In other words,

3    50 percent of the studies would indicate -- at least 50 percent

4    or more would indicate there was impairment at a certain low

5    BAC levels.

6    Q.    Would you look at the document that's Bates numbered

7    discovery 999?

8    A.    Correct.

9    Q.    Is that the table you were referring to?

10    A.    Right.  That's the table.  They discuss, you know, the

11    different papers and the -- For instance, there is a section on

12    the drowsiness, but they have the BAC range, the lowest BAC

13    which impairment was found in any study, and then the

14    impairment -- the values impairment was found by at least 50

15    percent of the studies.

16    Q.    Now, taking your knowledge of impairment, I just want to

17    walk through a night of drinking.

18    So I'm out on the town, I have a couple of drinks, I

19    push my blood-alcohol level above zero to, say, a .02.  What

20    type of impairment does a person start to suffer at a .02?

21    A.    At a .02, you're going to see problems with divided

22    attention, which is an important -- and drowsiness, and it can

23    be kind of a deadly impairment, because divided attention,

24    that's a circumstance where there's not a simple reaction.

25    That's a -- Well, divided attention is -- Excuse me.  Divided

1  attention is your ability to do more than one thing.  And this
2  is what you have to do to drive -- when you drive.
3          You have to monitor the work -- You have to steer,
4  you have to apply the gas to give you the appropriate speed,
5  you need to brake, you need to slow down, you need to slow down
6  when you need it.  You need to monitor the road, you need to
7  monitor for street signs and lights.  So it's an important
8  skill, and if your divided attention is impaired, your ability
9  to react to an emergency is impaired.
10 Q.    So, then, I get another round, push my BAC up another
11 notch or two, to, say, a .05.  Another couple rounds.
12 A.    That's .2.  That's also going to be your choice reaction
13 time, and that's also going to be your -- when you finally do
14 notice -- when you do notice the emergency or you notice the
15 orange barrel in the road.  Then you have to decide, What am I
16 going to do?  Am I going to steer away from it?  Am I going to
17 stop?  You have to make -- You see a stimulus.  You have to
18 decide how you're going to react to it.  That's your choice
19 reaction time.
20         And also by .05 we've got the combination of the
21 drowsiness and impairment, your ability to track, which is
22 steering, in other words, track, stay within the lane.  There's
23 different tracking to stay within the lane, the tracking in
24 relation to the other traffic that's around you.  That's all
25 impaired by a .05 to .06.  Impairment begins, you know, and it

1  just increases with the level BAC.

2              THE COURT:  Would this be a good point to take our

3  break --

4              MR. BAKER:  Sure.

5              THE COURT:  -- at this point?  So I'll see you back

6  at 2:00.  The opinion -- there may be another one, but the

7  opinion I was thinking of, as far as when somebody called the

8  other's expert, I kind of glanced at it.  I'm not sure how much

9  it will be helpful.  It may give you some guidance.  It's

10  Laurel Boutwell versus Southwest Commercial Management.  It's

11  2009 WL -- excuse me -- WL 2950839, August 7, 2009.

12             A little bit of discussion about calling the expert

13  retained by opposing party, so it may give you a little

14  guidance as to some thoughts I've had in the past.

15             Also, I think Ms. Wild was looking at for us getting

16  together I think on Dr. Reyes's testimony is either May 23rd or

17  24th.  So y'all might look at your calendars and see if those

18  are good dates for you to get back.

19             MR. BAKER:  Your Honor, I know we're not going to

20  fully address it today, but this issue of relevance has come

21  up --

22             THE COURT:  Yes.

23             MR. BAKER:  -- and I just thought I'd mention a case

24  to look at in addition to the Jenita Chavez that the defense

25  cited, is the Day case, which is the Supreme Court decision

1  where they first addressed the change in New Mexico's DUI law

2  from a pinpoint in time to a three-hour window and the

3  circumstances under which retrograde extrapolation may not only

4  be permitted to be offered by the prosecution, but is required

5  to be offered by the prosecution.  And that's at paragraphs 28

6  to 31 of that case.  So just to frame the issue, I thought I'd

7  mention it.

8          THE COURT:  All right.  So I'll see y'all back at

9  2:00.

10          MR. WINDER:  Your Honor, can we have a copy of that

11  opinion?  Is that possible?

12          THE COURT:  Yes.  Yes.  Maybe Ms. Wild can make that

13  for you.  I'm going to head out.  Well, you'll see the section

14  it involves.

15          MR. BAKER:  Thank you, Your Honor.  I'm sorry for

16  your task for the day.

17          THE COURT:  I'm sorry that I've got to break up your

18  testimony, and I appreciate, again, your cooperation with my

19  schedule today.

20          All right.  See y'all at 2:00.

21      (Court stood in recess at 9:34 a.m. and resumed at

22      2:02 p.m. as follows:)

23          THE COURT:  All right.  We'll go back on the record.

24          Ms. Drez, if you wish to resume your place in the

25  witness box, I'll remind you that you're still under oath.

1        Mr. Baker, if you wish to continue direct examination

2   of Ms. Drez.

3        MR. BAKER:  Thank you, Your Honor.

4        THE COURT:  Mr. Baker.

5   Q.  (By Mr. Baker)  Ms. Drez, I think when we left off we were

6   talking about the impairment that people suffer through the

7   course of a night of drinking as their blood-alcohol content

8   raises.

9   A.   Correct.

10  Q.   And I think we talked about getting from about zero to a

11  .05, and we were beginning to discuss the impairment effects

12  that a person would suffer at a .05.  Is that correct?

13  A.   In relationship especially to driving, yes.

14  Q.   Yes.  Would you -- Picking up at a .05, say a person's

15  been out, they've had enough drinks in their system to get

16  their blood-alcohol content to .05.  At that point they decided

17  to drive.  What type of impairment effects are they going to

18  have if they take the wheel?

19  A.   I think we previously discussed that the steering effects

20  and their divided attention, we start seeing a level that the

21  choice reaction time is impaired.

22  Q.   Now, as you go up from there, say the person continues to

23  drink, they push their blood-alcohol content up to a .07 to

24  .08.  What type of impairments are you seeing in that area?

25  A.   Well, judgment is what goes first.  Your judgment, your

1    thinking, like your ability to do divided attention.  Then your

2    muscular effects, like the steering and the hand-eye

3    coordination begin to be affected with the steering in .05, and

4    when we approach .06 to .08 is when we start to see actual

5    sensory motor impairment; in other words, the fine use of

6    muscles and motion, balance.  For instance, the field sobriety

7    tests address, you know, the balance and coordination,

8    following directions.

9    Q.   All right.  What I'd like to do now -- we talked about

10   impairment -- I want to shift gears back to the blood-alcohol

11   content and specifically the opinions you reached regarding

12   retrograde extrapolation of Mr. Tsosie's BAC.

13   A.   Okay.

14   Q.   If you look at 2-A -- I'm actually going to put it up on

15   the overhead so it should be visible to you.

16              This is a chart that you prepared, correct?

17   A.   Correct.

18   Q.   Would you walk the Court through what you've represented

19   on this chart?

20   A.   Okay.  This chart was made when it was established that

21   the actual blood draw was at -- 6:15 was the time of the blood

22   draw.  It incorporates the facts that the last drink was at

23   11:00 p.m., and, as I think I mentioned before, two hours is a

24   generous time, is going to the outer limits' time that if

25   somebody has been drinking, when they stop drinking, even if

1   they've had some food or other things that would slow

2   absorption by two hours, they have reached their maximum BAC

3   and should begin going in the elimination phase.

4        And assuming that the last drink was at 11:00 p.m.,

5   my extrapolation goes to 1:15 a.m., which is approximately two

6   hours after he stopped drinking.

7        Another point on the graph is the 0.07, and that

8   is -- denotes the collection time of the blood.  That's the

9   value we know for the blood at 6:15 while he was in the

10  emergency room.

11       Then I have the little photo of the little crash at

12  5:15, which is about -- we know the accident was called in

13  about 5:11, is the time that the accident was reported, at

14  5:11.

15       And I've looked at two different scenarios to

16  encompass the whole range of possible BAC's.  The lighter blue

17  line with the little square data points represents an

18  elimination rate of .01 BAC per hour, which I think we

19  discussed earlier is a conservative look at the lowest BAC

20  average in a general population.

21       Then the darker line with the little triangles in it

22  is -- represents an elimination rate of 0.02 BAC per hour,

23  which is generally accepted in most papers that I've read and

24  in text that the average social drinker is going to fall within

25  that .01 to .02 BAC.

1          So I made that the limit for my range that I was
2    going to consider.
3          So, the triangle, the area between those two lines
4    would represent the range of possible blood-alcohol levels to
5    be expected based on a value of 0.07 collected at 6:15 and
6    using the fact that the last drink or drinking stopped at
7    11:00 p.m. the preceding day.
8    Q.    Okay.  Now the .07 --
9    A.    Correct.
10   Q.    -- you're treating that as the floor on his BAC based on
11   blood draw, correct?
12   A.    Correct.
13   Q.    And that's a value that you reached without applying
14   retrograde extrapolation?
15   A.    Correct.  That's a known value that was obtained through
16   actual test.
17   Q.    Now, when you go back to the .08 to .09 range that you
18   reached for the time of the accident, I believe you mentioned
19   before that, once you've reached the elimination phase, the
20   human body has a linear decline.  Correct?
21   A.    Correct.  Down to the linear zero order is down to
22   approximately a .02.
23   Q.    Okay.
24   A.    For BAC's that low then, it's much more difficult to
25   extrapolate.

1  Q.   So based on that, so long as he was -- as Mr. Tsosie was

2  in the elimination phase, the one-hour retrograde from .07 at

3  6:15 to .08 to .09 at the time of the crash is going to apply,

4  correct?

5  A.   Correct.

6  Q.   Now, with regard to the left side of the chart, where

7  you're discussing the last drink at 11:00 and when you entered

8  the elimination phase.

9  A.   What I did is, using the fact that it had been six hours

10  until -- since he had had his last drink, I did the graph -- I

11  extrapolated back until two hours, till -- 1:15 represented two

12  hours after his last drink, so I felt confident in predicting a

13  BAC level up to that point.

14  Q.   In making any of the assumptions and applying the

15  knowledge of toxicology to reach the information that's in the

16  opinions reflected on this chart, at any point did you make an

17  assumption that led to a higher conclusion on the range of

18  possibilities you had?  I mean, a -- I guess a different way to

19  say it is --

20  A.   Well, in examining the facts, stated that the drinking

21  stopped at 11:00 and that the only -- or the statement that

22  there was only three -- three drinks, it -- it just didn't

23  correlate.  I would -- Three drinks in someone approximately

24  Mr. Tsosie's size -- there was a couple different weights, but

25  just as a rough -- about .02 per beer.  We don't know whether

1   it's four 14-ounce or 16-ounce drafts or 4 or 5 percent, but

2   .06 to .08 would be something in the range that I would expect

3   to see the BAC from three drinks, but at that amount there

4   should not have been any alcohol at the -- at 6:15, so it -- it

5   appeared to me that the BAC must have been -- was much higher

6   earlier in the evening and there might have been more alcohol

7   contributing to the BAC than three beers.

8   Q.  If a person actually only drank three beers and stopped at

9   11:00, is there any way he's going to be at a .07 at 6:15 a.m.?

10  A.  Looking at it from what I know of metabolism and

11  experiences and literature, that would be extremely --

12  extremely unlikely.  Near impossible.  It just -- It just

13  wouldn't make a good scientific sense.  It wouldn't correlate

14  with what I've studied and learned in my course of DWI's.

15  Q.  I want to break down some of what you'd said a little

16  earlier in component parts.  When you said a .06 to .08, did I

17  understand you correctly to be saying that at Mr. Tsosie's

18  peak, if he'd only drank three beers, the highest you would

19  expect to see is --

20  A.  All the alcohol from three beers, if it was contributed

21  all at once, sort of like the ideal, that would have been -- if

22  he consumed three beers very quickly, that would have been the

23  maximum BAC I would have expected.  But if you had three beers

24  over a course of two or three hours, I would expect even less

25  BAC, because the elimination rate is -- the metabolism is going

1  at the same rate the entire time the alcohol is circulating.

2  You just can't make any judgments about it or use it to

3  calculate a previous BAC unless you have the other facts, of

4  the length of time and the drinks, et cetera.

5  Q.   Is a peak BAC within the hour after following drinking

6  probably a .06 to .08?

7  A.   Correct.  If the alcohol was consumed very quickly -- a

8  very quick fashion.

9  Q.   And then you would have eliminated down to zero sometime

10 well before 5:15 a.m.?

11 A.   Correct.

12 Q.   Elimination rates have been the subject of testing,

13 correct?

14 A.   Correct.

15 Q.   And extrapolation has also been the subject of

16 peer-reviewed publications, correct?

17 A.   Correct.

18 Q.   And we looked at some of the peer-reviewed literature and

19 the tests earlier this morning, correct?

20 A.   Correct.

21 Q.   The technique you used here is generally accepted amongst

22 forensic toxicologists?

23 A.   Among toxicologists that do retrograde extrapolation, yes,

24 for alcohol.

25 Q.   And as a forensic toxicologist, do you feel confident that

1  this is an accurate depiction of Mr. Tsosie's blood-alcohol

2  concentration starting at the time of the blood drawing going

3  back through the course of the evening leading up to the crash?

4  A.    Based on a blood alcohol level of .07 at 6:15 and the

5  ceasing of drinking, it's, I believe, a fair and accurate

6  depiction of what happened during that interval.

7            MR. BAKER:  I'll pass the witness, Your Honor.

8            THE COURT:  Thank you, Mr. Baker.

9            Mr. Winder, do you have cross-examination of

10 Ms. Drez?

11           MR. WINDER:  May it please the Court?

12           THE COURT:  Mr. Winder.

13                     CROSS-EXAMINATION

14 BY MR. WINDER:

15 Q.    Good afternoon, Ms. Drez.

16 A.    Good afternoon.

17 Q.    Ms. Drez, we've had a chance to meet before, have we?

18 A.    Correct.

19 Q.    We met on May 23rd of this year?

20 A.    Right.

21 Q.    And we had a chance to talk about a report that you put

22 together on July 1st last year?

23 A.    Correct.

24 Q.    And during that interview you disclosed to me for the

25 first time that you had determined that the blood alcohol --

1  pardon me -- the blood draw was taken at 6:15 in the morning,

2  correct?

3  A.   Correct.  That was the information that I had been -- I

4  had received in documents and from the nurse.

5  Q.   We talked a little bit about your background.  You were

6  employed with the State for several years?

7  A.   Correct.

8  Q.   And how long were you employed, again, for the State?

9  A.   Twenty-one years.

10  Q.   Twenty-one years.  And so when you were retained by the

11  State, I assume that you were on salary.  So you weren't paid a

12  specific sum from the Government for testimony, correct?

13  A.   Correct.

14  Q.   And you left the State -- When did you leave, again?

15  A.   I retired at the end of December of last year.

16  Q.   And you have your own consulting firm now?

17  A.   Correct.

18  Q.   Or consulting -- Maybe not a firm.

19  A.   Well, I don't firm.  I just still do it.  There aren't

20  very many people.  But still do it.

21  Q.   So you produced another report after March 23rd, did you

22  not?

23  A.   Correct.

24  Q.   And that report was dated April 21st of this year?

25  A.   Or the 14th, something like that.

1    Q.    Something like that?

2    A.    Correct.

3    Q.    Sometime in the end of April?

4    A.    Right.

5    Q.    How much were you paid by the Government to produce that

6    report?

7    A.    The rate, I think, is $225.

8    Q.    So $225 per hour?

9          Now, how many hours did it take you to produce that

10   report?

11   A.    For that report, probably actually producing the report,

12   maybe four or five hours.  I'd have to look at my notes.

13   Q.    Okay.  But you're being paid now?  You weren't being paid

14   before, but you're being paid for your services by the

15   Government?

16   A.    Correct.

17   Q.    Now, when you worked for the State, I think you said you

18   testified in court maybe -- I didn't calculate it, but over

19   maybe 150 times possibly?

20   A.    Possibly, but that was part of my job description.  I was

21   expected and required to appear in court regularly.

22   Q.    And it's fair to say that during that time you never

23   testified on behalf of a defendant.  Did you?

24   A.    Actually, a couple of times I was subpoenaed by defense

25   lawyers to testify.  There were actually licensing regulations

1   hearings and they -- I was subpoenaed to testify about the

2   accuracy and reliability of those breath instruments used in

3   those cases.

4   Q.   But would it be fair to say the majority of times you

5   testified it was for the State?

6   A.   Correct.

7   Q.   Okay.  Let's talk about the -- You worked for the State

8   for twenty-plus years.  I'm sure you're familiar with the

9   regulations that are used to obtain blood samples --

10  A.   Correct.

11  Q.   -- from individuals.  Correct?

12  A.   Correct.

13  Q.   Can you just give me an idea what the regulations -- what

14  the protocol is when you get a blood sample from law

15  enforcement when it's given to your lab?

16  A.   For law enforcement?  We do issue -- The lab issues kits,

17  and they -- those kits are used to collect the blood, and then

18  the nurse collects the blood, the nurse provides -- the tubes

19  are sealed at the direction of the officer, and then the tubes

20  are mailed back to the lab.

21  Q.   When you get that -- When you get the kid from law

22  enforcement, I assume that there's a protocol chain of custody

23  just to make sure there's no contamination of the blood.

24  Correct?

25  A.   Correct.  There's a chain of custody, yes.  They're logged

1    in when they come into the lab and a chain of custody is

2    maintained once they enter the lab.

3    Q.    So you're very familiar with the protocol procedures --

4    A.    Correct.

5    Q.    -- as you worked for the State?

6    A.    Yes.

7    Q.    And now, are there times when you receive blood samples

8    from hospitals, as well?

9    A.    No.  The laboratory accepts the blood alcohol kits only.

10   Q.    There's not a blood kit in this case, is there?

11   A.    No, there isn't.

12   Q.    Do you think that that's a problem?

13   A.    It's unusual, but there have -- the laboratory has -- I'm

14   trying to think now.  I believe we've -- the different cases --

15   I can't remember which ones -- were sampled by the lab or the

16   blood.

17          Basically, at least in the recent times, the only --

18   the lab, because of the high volume and backlog, I know

19   restricted their work to the laboratory kits.

20   Q.    You said it was unusual.  Why is that unusual?

21   A.    Because generally the officers do collect the blood from a

22   kit.

23   Q.    So in this case you have no kit, you have no independent

24   knowledge, other than you talking to a nurse, as to when that

25   blood sample was taken, correct?

1   A.   Correct.  I'm relying on that information, yes.

2   Q.   Now, I've looked at the information that you've seen with

3   regard to the heplock.  Can you please tell the judge what a

4   heplock is?

5   A.   A heplock is when they insert an IV.  It's a mechanism so

6   that they can administer different drugs through the heplock

7   into the IV without disrupting the IV.  And I believe the hep

8   part, it's like got heparin in it to help prevent clotting.

9   Q.   It's to prevent clotting, correct?

10  A.   Correct.

11  Q.   So do you have any independent knowledge of whether or not

12  there were any medications that were administered to Mr. Tsosie

13  with that heplock?

14  A.   I think, you know, they indicated that normal saline was

15  indicated, and somewhere on there was like morphine and some

16  other things, but I don't know when they were administered in

17  relationship to the blood test.

18  Q.   So you have no idea if it was administered before the

19  blood test or after the blood test?

20  A.   I wouldn't have noted that much, so right now -- Maybe if

21  I looked at the notes I could figure something out, but

22  generally I would say no.

23  Q.   Do you want to take some time to look at the notes now and

24  see if there's anything in there that could help you out?

25  A.   Do you know which section that was?

1   Q.    I'm not sure myself.  I'll have to look.

2   A.    Okay.  Yeah.  I found it.  It's in D-5, at least where the

3   heplock, and it looks like there were several boluses of saline

4   added, Toradol, and something else.

5   Q.    We don't know what that "else" is, do we?

6   A.    No.  It's some kind of abbreviation.

7   Q.    It could have been medication?  We don't know, right?

8   A.    Correct.

9   Q.    And that medication could have been prescribed or given to

10   Mr. Tsosie before the blood sample was taken, correct?

11   A.    Well, there are times.  It indicates a time of 7:30.  In

12   fact, it looks like the only indications in the nurse's notes

13   are saline up to 6:55, and then I see some other medications.

14   Q.    Now, with regard to the heplock, I assume that they had to

15   inject something into Mr. Tsosie's arm to get the saline into

16   his system.  Correct?

17   A.    Well, they had to insert a needle, yes.

18   Q.    And normally needles -- sometimes just for safety purposes

19   there's rubbing alcohol that is used for those needles,

20   correct?

21   A.    Usually, the nurse swabs with something before she inserts

22   a needle, right.

23   Q.    So we can assume, if she was doing her job correctly, that

24   she would have put rubbing alcohol on the area before --

25   A.    She would have put some disinfectant, but I really have no

1  idea what disinfectant she used.  I would have to --

2  Q.   Now, just getting back to the March 23rd meeting that we

3  had, when we learned for the first time that the blood was

4  drawn at 6:15 -- But before I ask the question, there's nothing

5  in this report that indicates that that blood draw was taken at

6  6:15, correct?  Before you answer, I'm not asking --

7  A.   No.  Just looking at the report, no.

8  Q.   Nothing whatsoever?

9  A.   Correct.

10  Q.   So all you have is information from the nurse that you

11  spoke to?

12  A.   Correct.

13  Q.   Now, when you set forth your original report, you put

14  together some analysis with regards to what you believed the

15  blood-alcohol level would be under some circumstances, correct?

16  A.   Correct.

17  Q.   And before I ask that question, can you -- I mean, you

18  used the word "retrograde extrapolation" a lot of times today.

19  For a layman, what is retrograde extrapolation?  What is it?

20  A.   Well, extrapolation is extending your values beyond the

21  data points that you have.  Retrograde -- There's retrograde

22  extrapolation, which predicts what the BAC may have been in an

23  earlier period before a sample was taken.  There's also forward

24  extrapolation, where people may predict what the blood alcohol

25  level is going to be looking at what alcohol they've consumed.

55

1          This is like done, say, if you're going to do a

2     drinking session, you're trying to get your subjects up to a

3     certain blood-alcohol level, and you extrapolate, you -- We do

4     not extrapolate.  You try to figure out how much alcohol

5     they're going to need to get to the appropriate -- the target

6     blood-alcohol level you're looking for.

7     Q.   Thank you.

8          I'm just looking at your report.  You indicate

9     that -- this is before you had the information from the

10    nurse -- that -- I'm just referring to Government's Exhibit D-1

11    under the discussion "Blood alcohol levels at the time of the

12    crash."

13         In your report, you indicated that even without

14    confirmation of exact time of the blood draw the results

15    confirm that Mr. Tsosie's blood alcohol was no lower, most

16    probably higher than 0.71 at the time of the collision.

17         Maybe I misheard your testimony on direct

18    examination, that -- but that seems to be inconsistent with

19    what you said on direct examination.  Maybe I misheard it.  You

20    said his blood-alcohol level would have been between .08 and

21    .09.

22         My question is, why would you write that based --

23    .071?

24    A.   Because at the time I had no direction or information.

25    The reports and the medical records said he came in at 6:00.

Danna Schutte Everett
Official United States Court Reporter
333 Lomas Boulevard, Northwest
(505) 348-2283

1  There was one time I had a page with blood-alcohol results that
2  was timed at seven-something, and then the doctor wrote the
3  report which had those values at 8:00.
4          So I could be sure that somewhere between 6:00 and
5  8:00 a blood sample was taken and tested, but I did not feel
6  comfortable -- There was no direction, no information given to
7  me to pinpoint a discrete period of time when that sample had
8  been taken, and so in, I think, that paper I did send a graph
9  looking at the possible BAC's in all scenarios -- if it had
10  been taken at 6:00, if it had been taken at 7:00, if it had
11  been taken at 8:00 -- and I used all the premises that I used
12  in the second graph.  It's just in the first graph there was
13  too many -- too many variables to make a definite, you know,
14  evaluation of that time.
15  Q.   Let's talk about premises.  What premises did you take
16  into account on July 1st and you now have different premises in
17  April?  What were the premises that you took into account on
18  July 1st in your report?
19  A.   The only -- The only different premise was that a blood
20  sample was taken at 6:15.  In July, I also stated that was --
21  two hours he would have been in the elimination phase and that
22  he was declining, and, essentially, I believe everything was
23  the same except that I didn't look at a discrete time and a
24  discrete range for the blood-alcohol level.
25  Q.   And that information, that you have no independent

1   knowledge of -- And there's nothing in the reports to indicate

2   when that blood draw was taken, correct?

3   A.   Other than the notes and oral confirmation, yes.

4   Q.   So you have no independent knowledge.

5               Let's look further in your report, then, your

6   July 1st report.  You indicate that -- It's on the second page

7   of your report.  In the event that the blood was taken

8   immediately upon arrival at the emergency room the lowest

9   blood-alcohol level at the time of the crash was between .07 to

10  .09.

11              So if you don't know when the blood sample was

12  taken -- this is a complex question.  I apologize.  But if you

13  don't know -- you have no independent knowledge of when the

14  blood sample was taken and in this report you say that if the

15  blood sample is taken immediately at the emergency room, the

16  blood-alcohol level at the time of crash was between .07 to

17  .09?

18  A.   Correct.

19  Q.   Is that your same testimony today, or have you -- or is

20  your testimony different today?

21  A.   Well, immediate arrival was at 6:00.

22  Q.   I'm just reading what -- in your report.  You're saying in

23  the event -- Because we're making an assumption here.  You have

24  no independent knowledge, there's nothing in the reports that

25  indicate when the blood sample was taken.  So I assume that

1   when you wrote this report, that you made some assumptions.

2   And here there's an assumption that if the blood sample was

3   taken immediately, that the lowest it could have been is .07 to

4   .09.  I'm just trying to confirm if that is accurate.

5   A.   Well, the .07 was the lowest it could possibly -- It

6   couldn't be any lower than that.

7   Q.   So it could have been .07?  That's your testimony today?

8   A.   No.  That's what I meant when I said it was between .07 to

9   .09.  After, with the information of the blood draw --

10  Q.   I'm just -- I'm just -- I'm sorry.  I don't want to just

11  beat this like a dead horse, but my question to you is, if you

12  have no independent knowledge of whether that blood sample was

13  taken, in your report, you say, in the event that the blood

14  sample was taken immediately upon arrival at the emergency

15  room, the lowest it could have been a .07.  So my question is,

16  in your report, you're opining that his blood-alcohol level

17  could have been .07 at the time of the crash.

18  A.   That's the lowest it could have possibly been, yes.

19  Q.   So it could have been .07 at the time of the crash?

20  A.   Not likely.

21  Q.   Not likely, but it could have been, correct?

22  A.   If that -- If the blood was taken immediately, based on --

23  If the blood -- That's why I said, if the blood was taken

24  immediately and we're going to just look at two decimal points,

25  technically, yes, possibly the reading could be a .07.

1  Q.   So it could have been .07?

2         MR. BAKER:  Objection, Your Honor.  Asked and

3  answered repeatedly.

4         THE COURT:  Overruled.

5  Q.  (By Mr. Winder)  I believe you can answer that question.

6  A.   Pardon?  Oh, oh, okay.  Could you repeat it again?

7  Q.   So it could have been .07 at the time of the crash,

8  correct?

9  A.   It's an unlikely value, but what I was speaking to was

10  because of the distance of time from the last drink until the

11  blood test --

12  Q.   Ma'am, there --

13  A.   -- there was no way it could have been higher, so it could

14  have been no lower than that.

15  Q.   The reason why I asked you the question several times, I

16  just want a yes or no.  My question was, it could have been .07

17  based upon your report?  And all I want is a yes or no.

18  A.   Someone could interpret that, yes.

19  Q.   Okay.  Now, are you familiar with the term of time curves,

20  blood concentration time curves?

21  A.   In what context?

22  Q.   Well, in the context of trying to determine what someone's

23  blood-alcohol content might be.

24  A.   Okay.  Yes, I think I understand what you're -- what you

25  mean now, yes.

1  Q.   The reason I'm asking that question is because I'm looking

2  at a decision that was rendered by the New Mexico Supreme

3  Court, which Mr. Nayback was kind enough to bring to my

4  attention today, with regard to retrograde extrapolation.

5  A.   Okay.

6  Q.   Would it be fair to say that your -- in your -- the chart,

7  that you have a straight-line analysis with regard to your

8  extrapolation?  Straight line.  There's no curves in your

9  graph, correct?

10  A.   To the point -- My graph only is looking at the

11  elimination phase.  I'm not looking at the whole curve from the

12  time he began and the two hours after he was drinking.

13  Q.   So there's no curves in your graph, correct?

14  A.   I did not include them, no.

15  Q.   Okay.  So are you familiar with the Jim Frazier

16  "Admissibility and Sufficiency of Extrapolation in DUI

17  Prosecutions"?  Are you familiar with that publication?

18  A.   It doesn't ring a bell.  Maybe I read it.  Maybe I don't

19  recognize the name.  No.

20  Q.   Okay.  The New Mexico Supreme Court has cited to

21  Mr. Frazier with regard to retrograde extrapolation.  With

22  regard to at least Mr. Frazier, he indicates the rate is not

23  constant, but varies over time.  Describing a curve, rather

24  than a straight line.

25          So in your analysis you assume a straight line,

1    there's no curves with regard to your analysis with regard to
2    what Mr. Tsosie's blood-alcohol level was at the time of the
3    crash, correct?
4    A.    What I was talking about is, because there was six hours
5    from the time of the crash, I didn't go back till the time --
6    It wasn't -- It wasn't -- They're irrelevant and did not give
7    any information to go back to when he first drank.
8            There is a curve, but this graph only represents the
9    last -- let's see -- four or five hours from the -- from the
10   time the blood sample was taken.  It doesn't go -- Usually, a
11   blood-alcohol curve is looking at monitoring the blood-alcohol
12   level going up and reaching a peak, which can be maintained for
13   a certain amount of time.
14           I believe in the report I talked about he would have
15   reached a maximum BAC within three hours -- 30 minutes to an
16   hour, and then he could have possibly maintained a peak for
17   several hours, but by the time we got to 1:15 -- And
18   particularly in this first one I only did back to 5:00, the
19   time of the crash.  That information, it wasn't necessary for
20   this extrap- -- to illustrate what I was looking at for this
21   extrapolation.
22   Q.    Okay.  Well, at least the Supreme Court has indicated --
23   the New Mexico Supreme Court has indicated for purposes of
24   scientific retrograde extrapolation evidence, citing to the
25   author which I set forth earlier, that there is a curve, rather

1  than a straight line.  And there are in one -- Mr. Frazier has

2  indicated that determining the shape and curve is a science.

3          So my question is, given your analysis, you know that

4  Mr. Tsosie -- the last time he drank any alcohol, was

5  11:00 p.m., correct?

6  A.    Correct.

7  Q.    Do you know when Mr. Tsosie last ate?

8  A.    No, I don't.

9  Q.    Do you think that would be important information to have

10 available to you to determine what the blood-alcohol content

11 would be with regard to retrograde extrapolation?

12 A.    It was considered that I did not have that information,

13 that I made the assumption that there was at least two hours

14 before the extrapolation would begin a linear decline.

15 Q.    So you made an assumption?

16 A.    Since I did not know, I had to assume that that can be a

17 factor and consider that in my extrapolation.

18 Q.    Well, at least the New Mexico Supreme Court indicates that

19 that is an important factor with regard to scientific

20 retrograde extrapolation.  If they believe that's important and

21 you don't have any idea as to what -- when the last time

22 Mr. Tsosie ate, how can you testify with a reasonable degree of

23 scientific certainty what Mr. Tsosie's blood-alcohol level was

24 at the time of the crash?

25 A.    Because the studies that I have -- for instance, the Jones

study, that did a thousand drivers, I'm sure several of them
had been drinking during the time; that the Gannett study of
social drinking, they were eating snacks during the drinking
session and they had lunch after they stopped drinking.  So
there was food involved.  So in both these studies they were
looking at these factors and what effect they would have on the
beginning of the elimination phase.  Well, they were looking at
reaching the peak and the elimination phase.

Q.   Well, the concern I have is that this is a statement or a
citation to Jim Frazier for Admissibility and Sufficiency of
Extrapolation Evidence in DUI Prosecutions, which the
New Mexico Supreme Court issued with regard to scientific
extrapolation evidence.  And you had told me earlier you
haven't even heard of this person.  That's the concern I have.
You have these other studies, but you have not -- you didn't
take into account this study in your analysis.  Would that be
fair to say?

          MR. BAKER:  Your Honor, I just have an objection.
There's a lot of argument followed by a five-sentence --
five-word sentence.

          THE COURT:  There is.  I do think there is a question
there.

          MR. BAKER:  We'll have plenty of time to argue at the
end.

          THE COURT:  That's true.  Just ask your question.

1           MR. WINDER:  I apologize.

2    Q.   So you have not read that analysis of Mr. Frazier; is that

3    correct?

4    A.   If I did, I don't remember it, no.

5    Q.   Well, if you had read it, you didn't cite to it in your

6    report, did you?

7    A.   That's not one of the -- I was looking at the studies that

8    I consider relevant and important.

9    Q.   Do you think it would have been important to make

10   reference to that report, given that the New Mexico Supreme

11   Court cited to it with regard to retrograde extrapolations?

12   A.   I would have to look and see -- look at that report and

13   consider, where does it come from?  Does it come from a

14   peer-reviewed journal?  Is it something that -- the background.

15   Q.   I don't know whether it's been subject to peer review.  At

16   least it's been cited by the New Mexico Supreme Court.

17           I'll move on.  Thank you, ma'am.

18           With regard to -- There was some testimony with

19   regard to the liver --

20   A.   Correct.

21   Q.   -- of a person.  Can you please describe to me, if you

22   could -- I'll just look at my notes.

23           With regard to metabolism, is it correct to assume

24   that the liver metabolizes alcohol?

25   A.   Correct.

Q.   And is it also fair to make the assumption that the liver
would be a very important organ if a person has experienced
trauma?

A.   Important in what sense?  I'm sure doctors look at it
immediately, because it bleeds very -- injury to the liver can
be very serious, but --

Q.   Okay.  But you know that Mr. Tsosie was -- obviously was
involved in this accident, as well?

A.   Correct.

Q.   Are you aware that there was some blood loss as a result
of this injury?

A.   I don't remember -- I would assume probably there was,
because they were giving him so much saline.  Yes.

Q.   If there was blood loss that Mr. Tsosie had obtained, that
might impact the liver function, which you testified earlier a
liver has -- is directly tied to metabolism.  Correct?

A.   Correct.

Q.   Did you take into account, with regard to your
assumptions, with regard to any trauma that Mr. Tsosie may have
experienced?

A.   I do take into account, particularly one of the pitfalls
in taking blood from the IV is because the most prevalent
effect is it could -- if it's taken downstream, the excess
fluid would have diluted his blood-alcohol value and done a
lower value.

1    Q.    Let's talk about a plateau.  You used the term "plateau"

2    in your direct examination.  Do you remember that?

3    A.    Correct.

4    Q.    Can you explain to the Court what that is?

5    A.    There's essentially three -- If you want to look at --

6    When you're extrapolating, there's the absorption phase, where

7    the alcohol is being absorbed, and then it will reach a peak,

8    and the peak doesn't necessarily mean that you've reached the

9    elimination phase.  It means that you've reached the maximum

10   alcohol, but that based on other factors, like, as we mentioned

11   food, different food in particularly can slow down the

12   absorption of the alcohol, and if you look at metabolism, if

13   you look at a bathtub, the liver is the drain, the drain is

14   working all the time, and if the alcohol's coming into the

15   bathtub, it's filling up, and then there's a certain time --

16   and I don't know if you've ever, just to keep the tub warm, you

17   know, you kind of turn -- you kind of learn the faucet -- leave

18   the bottom -- My late husband used to do this for his son, and

19   he would leave it unplugged, and then he would turn on the hot

20   water just a slight way so that it didn't drain -- the drain

21   was still draining, but the alcohol as still coming in and

22   maintaining the same level in the bathtub.  Well, that's the

23   plateau.

24          The alcohol is still being absorbed, but the

25   elimination rate is exceeding -- or even with the absorption

1    rate -- and this can go on for several minutes or, generally,

2    you know, as I said, up to about two hours, what I used in my

3    extrapolation.  The plateau will finally -- somewhat you turn

4    off the faucet, no more alcohol's being absorbed, and then the

5    BAC starts to lower in a regular fashion.  And it's -- And

6    it's -- You're able to determine that slope by looking at the

7    graph.

8    Q.    Thank you, ma'am.

9          I want to talk a little bit about some issues that I

10   believe are related to cross-examination, because you talked

11   about the liver on your direct examination.

12         What is adrenaline?

13   A.    Adrenaline is a hormone.

14   Q.    Okay.  It's a hormone, and it -- With adrenaline, the

15   heart rate is increased, is that not right?

16   A.    Correct.  Right.  It's associated with a fight-or-flight

17   reflex.

18   Q.    Blood vessels restrict?

19   A.    Correct.

20   Q.    Air passages can be dilated?

21   A.    It's possible, yes.

22   Q.    Would it be fair to say that adrenaline triggers a number

23   of metabolic changes?  Correct?

24   A.    Correct.

25   Q.    And it stimulates glycogenal cysts -- if I'm saying that

1 right -- in the liver?

2 A.   I won't know whether I can go that confident in all the

3 little metabolisms of the liver, yes, but --

4 Q.   But the liver does metabolize alcohol?

5 A.   Correct.

6 Q.   With regard to the impact that Mr. Tsosie had in this

7 accident, did you take into account these factors which I just

8 set forth?

9 A.   Well, actually, for 20 years, I've been doing medical

10 examiner work and analysis and looking at DWI's -- and looking

11 at DWI's, and I don't really see any noticeable effect from the

12 adrenaline shock.  I mean, most people when they get stopped --

13 for a lot of people when they get stopped, some of them are so

14 intoxicated I guess they don't get upset.  It's just not -- In

15 the simple order of alcohol metabolism, it doesn't appear to

16 have that much of an effect in the data.

17 Q.   But you don't know in this case whether it did?

18 A.   I don't have any data, no, to --

19 Q.   Let's talk a little bit about issues involving -- We

20 talked a little bit about the protocols in place at the State

21 with regard to obtaining blood samples?

22 A.   Correct.

23 Q.   And correct me if I'm wrong, but when you first started

24 with the State the majority of your work was with regard to

25 breath tests, correct?

1   A.    Towards the end of my career, I just did the breath tests.

2   For the first 19 years, it's just strictly I dealt with the

3   blood -- blood testing, also.

4   Q.    So it was blood testing that you were involved with?

5              Well, did you ever give training to persons with

6   regard to obtaining blood samples?

7   A.    When we give our operator courses for the breath operator

8   machines -- instruments, we give them a section that's

9   dedicated to doing a blood test.

10  Q.    Breath operators.  But with regard to obtaining --

11  A.    Right.  In many cases, the officers do not -- aren't able

12  to get a breath test.  So as part of our course we include this

13  information, because the entire course is on -- it's required

14  for breath alcohol certification, but it -- it's intended to

15  educate the officer as to the metabolism, the impairment of

16  alcohol to driving, the physiology, and acquaint them with the

17  symptoms, and it's because we are the Department of Health, we

18  do look at education, like the possibility of, you know,

19  acetone for the breath test if they get a substance.

20             So it's more than just how to punch the buttons.

21  It's a course on all facets of the alcohol in the -- a DWI

22  arrest.  And we talk about the cases where you're not going to

23  do a breath test, if there has been an accident.

24  Q.    Ma'am, my question's not with regard to breath tests.

25  With regard to obtaining blood samples.

1    A.    Right.  But what I'm saying is, in that course as part of

2    the course we also address a blood test and how to take a blood

3    test, because we have the officers there, and this is an

4    opportunity to educate them and they're educated on how to

5    obtain blood kits and how to -- if they can't do a breath test

6    and they want to do a blood test on a subject, the protocol and

7    what they need to do to collect the sample to send it to the

8    lab.

9    Q.    So what's --

10                THE COURT:  Mr. Winder, can you give me just a

11   minute?  I need to talk to Ms. Wild about something.

12         (A conference was held between Ms. Wild and the Court.)

13                THE COURT:  All right, Mr. Winder.  Thank you.

14                MR. WINDER:  Thank you, Your Honor.  May I proceed?

15                THE COURT:  You may.

16   Q.  (By Mr. Winder)  Okay.  What I was going to ask you is, if

17   you could tell me, based upon your training and experience,

18   what the procedures that one needs to do -- to obtain a blood

19   sample from an individual.

20   A.    Of course, they -- they have to be under arrest, and they

21   take them to a hospital or someone that has agreed to -- a

22   licensed nurse or doctor or a phlebotomist working at a

23   hospital.

24   Q.    I'm sorry.  Nurse or -- What did you say?  I'm sorry.

25   A.    A phlebotomist.

1    Q.   Go ahead.  I'm sorry.

2    A.   And they -- They're -- The kit contains two gray-topped

3    tubes and seals, and the kit is -- comes with a form in which

4    the officer fills out the name of the subject, the time that

5    the blood was taken, and all that information.  The nurse,

6    essentially -- her job is to take the blood, and then there's

7    a -- an area on the form that the nurse certifies that she took

8    this blood at this date and where she's employed.

9    Q.   Thank you.

10        You realize, in this case, that Mr. Tsosie, at the

11   time of his blood sample, he was not under arrest?  Do you know

12   that?

13   A.   I -- That wasn't -- information wasn't in the report.

14   Q.   Now, you testified that a person's taken to a hospital and

15   there is a licensed nurse.  Why is that a requirement?  Or a

16   phlebotomist.

17   A.   Why isn't --

18   Q.   Why is it important to get a licensed nurse?

19        I'll withdraw the question.  I'm sorry.

20        With regard to Ms. Gayla Bias, are you familiar with

21   her background?

22   A.   No.

23   Q.   You have no knowledge whether she's licensed or not?

24   A.   I don't know.  No.

25   Q.   Are you familiar with the procedures that are in place at

1   the Fort Defiance Indian Hospital with regard to obtaining

2   blood samples?

3   A.   No.

4   Q.   You testified that when the person gets a kit it is

5   important -- I assume it's important to know when that blood

6   sample was drawn.  Correct?

7   A.   Correct.

8   Q.   And the reason why that's important is because that's

9   going to be very helpful to you if you go into court to testify

10  with regard to scientific retrograde extrapolation, correct?

11  A.   Correct.  And then it correlates with the arrest.

12  Q.   And in this case there's nothing, there's no indication,

13  other than you talking to Nurse Bias, with regard to when this

14  blood sample was taken, correct?

15  A.   With the information I have now, yes.

16  Q.   Now, with regard to the heplock, you testified earlier

17  that you weren't sure whether -- if there was any medication

18  whether that was prescribed before or after the blood sample,

19  correct?

20  A.   Other than the notations of the times.

21  Q.   Let's assume hypothetically that there was medication,

22  painkiller medication that was prescribed to Mr. Tsosie and

23  that was prescribed before the blood-alcohol sample was

24  obtained.  That would have an impact on the blood sample, would

25  it not?

1   A.    It would not affect the blood-alcohol reading.

2   Q.    It would not impact it at all?

3   A.    No.

4   Q.    Okay.  If there -- You testified earlier that there might

5   have been rubbing alcohol that was used.  That would have an

6   impact, would it not?

7   A.    No.  If it -- If it was, it would be very slight, probably

8   below the cut-off for the test.

9   Q.    You say "very slight."  What does that mean?

10  A.    Some -- I've read some studies that have looked at that,

11  and we're talking at less than a .01.

12  Q.    What studies are they?

13  A.    One was looking at using the swabs for a DuPont clinical

14  analyzer.  There were several studies after there was an

15  incident in England where all of a sudden they realized they

16  weren't using nonalcohol swabs, and there were several studies

17  in England.

18          MR. WINDER:  Your Honor, with permission of the

19  Court, I request that Mr. Nayback provide those studies to me

20  after he's had a chance to talk with Ms. Drez.

21          THE COURT:  All right.  Let's maybe discuss that

22  after we get through with the testimony here.

23          Mr. Winder.

24          MR. WINDER:  Thank you.  Thank you.

25  Q.    (By Mr. Winder)  So any other studies that you're aware

1  of?

2  A.   Not recently.  I think there was one study that I saw

3  referenced that -- Tabaski -- that --

4  Q.   Now, with regard to the studies that you have set forth in

5  your report, there's the -- I'll just call it the Gannett

6  study, if I'm saying that correctly.

7  A.   Correct.  Uh-huh.

8  Q.   And that study was -- When was that study conducted,

9  again?

10  A.   I would have to look.

11  Q.   I'm sorry.  Let's just go ahead and make reference to it.

12  Okay?

13  A.   Okay.

14  Q.   And I'm not sure exactly where it's in the binder, but

15  I've got --

16  A.   It's D-1-E.

17  Q.   Thank you.  Now, that report -- I'm looking at page 2 of

18  the report, that indicates that the -- I'm just reading it.  "A

19  practice of retrograde extrapolation often requires the expert

20  to make several assumptions in order to provide an estimate of

21  a person's BAC at some point earlier in time."  Correct?

22  A.   Correct.

23  Q.   And in the second paragraph he indicates that in order for

24  the expert witness to be able to assess whether the

25  individual's BAC would have been rising or falling at the time

1  of the incident, the expert must have knowledge about the

2  effects that an individual's drinking pattern would have on the

3  DSE profile, correct?

4  A.    Correct.

5  Q.    Are you aware of Mr. Tsosie's drinking pattern?

6  A.    For that evening, other than the three beers at 11:00, no.

7  Q.    So my question is, are you aware -- other than that

8  evening are you aware of his drinking pattern?

9  A.    No.

10  Q.    And this study, which you set forth in your report,

11  indicates that for the purposes of retrograde extrapolation, it

12  is important to know what an individual's drinking pattern

13  would be, correct?

14  A.    You should use -- That's why you want to use a range, so

15  that you encompass the possible BAC levels.

16  Q.    He doesn't say that here.  He says the individual's

17  pattern, drinking pattern.  And it's your testimony that you

18  have no knowledge of Mr. Tsosie's drinking pattern, correct?

19  A.    Correct.

20  Q.    And so this Gannett study -- this paper that you have set

21  forth in your report -- he opines in his peer-reviewed report

22  that it would be important to know what an individual's

23  drinking pattern would be to come up with a number?  You don't

24  have that here?

25  A.    Correct.

1    Q.    Now, there's another -- the Jones study that I think is

2    referenced in your report.

3    A.    Correct.

4    Q.    That was a report involving individuals in Sweden?

5    A.    Correct.

6    Q.    And the paper's entitled "Influence of Age, Gender and

7    Blood Alcohol Concentration," correct?

8    A.    Correct.

9    Q.    Now, you're aware that my client is Navajo?

10   A.    I believe you mentioned it, yes.

11   Q.    Well, he is.

12          Are you aware of any studies that have been conducted

13   with regard to the metabolism for Native Americans with regard

14   to blood-alcohol content?

15   A.    When you brought that issue up at the hearing, I did some

16   searching, some quick scans on the Internet, and I found --

17   actually, I found abstracts that indicated all over the map.

18   Some lower, some higher, some indicated the diet and eating

19   habits, and I did not see anything that would prejudice me one

20   way or the other, that I believe in using a range of BAC's that

21   would encompass any variations.

22   Q.    I apologize in advance, but I'm going to ask you several

23   questions with regard to your answer.

24          You say all over the map.  I want to get to some

25   detail with regard to what you mean by all over the map.  What

1  did you mean by that?

2  A.   Some said that the metabolism was higher, some were lower,

3  some said it didn't make any difference.

4  Q.   So let's just talk about higher, lower or not making a

5  difference.  And if a Native American's metabolism is higher,

6  how would that impact your analysis with regard to retrograde

7  extrapolation?

8  A.   If it was higher, I would look more at the range of the

9  .02, that a BAC closer to the .02, possibly higher.

10  Q.   And if it was lower?

11  A.   It would be in the lower range.

12  Q.   But you didn't do that in this case, did you?  You didn't

13  put that in your report?

14  A.   No.

15  Q.   Is there any reason why this -- I notice there were

16  several reports from different parts -- from other places

17  besides the United States.  Is there any reason why this was

18  done in Sweden?

19  A.   Because A.W. Jones is, I would say, revered as one of the

20  experts in the field.  He's dedicated his life to, I would

21  say -- or his studies to alcohol.  He's a member of almost any

22  council that's going to be dealing with alcohol.  He -- When

23  I -- Indiana University holds a 40-week course twice a year to

24  help educate individuals who are going to be testing for DWI,

25  breath and blood, and which they have individuals come in that

1   are known experts in their field, and Dr. Jones -- I've gone to

2   that school twice, and Dr. Jones is always one of the most

3   important instructors at that class.

4   Q.    I forgot to mention, Mr. Gannett and the Bowthorpe study,

5   that was in Canada?

6   A.    Correct.

7   Q.    Are they revered, as well?

8   A.    Actually, Dr. Jones gave -- the last school I went to he

9   gave us that picture -- that paper and referred it to us as a

10  good study of social drinking.

11  Q.    So he thinks that this report is good, the person you

12  revere, that's revered?

13  A.    Correct.

14  Q.    And again, in that report, at least the Gannett study

15  indicates that it would be important to have knowledge of a

16  person's drinking pattern.  And you have no knowledge of

17  Mr. Tsosie's drinking pattern, correct?

18  A.    Correct.

19  Q.    Okay.  Let's talk a little bit about the impairment issues

20  that you testified on direct examination.  There were several

21  studies that you had set forth, as well, correct?

22  A.    Correct.  Reviews and studies, yes.

23  Q.    Impairment in driving is not necessarily associated with

24  someone drinking, correct?  I'll withdraw that question.

25          A person can be distracted talking on a cell phone,

1  correct?

2  A.    Correct.  Correct.

3  Q.    There's a number of things that can happen that can impact

4  a person's ability to stay in their own lane, correct?

5  A.    Correct.

6  Q.    Now, you looked at the reports in this case, correct?

7  A.    Correct.

8  Q.    Are you aware that Mr. Tsosie did not drift into any lane?

9         MR. BAKER:  Objection, Your Honor.  Mischaracterizes

10  the testimony or reports.

11         THE COURT:  It may, but let's see how she answers

12  this question.

13  A.    Not being an accident constructionist, I read the reports

14  and I believe the accident was -- when the accident occurred,

15  it was in -- he was in the correct lane for his direction.

16  Q.  (By Mr. Winder)  For Mr. Tsosie's direction?

17  A.    Right.

18  Q.    So the victims' vehicle went into his lane, correct?

19  A.    That's -- That's where they were for the time of the

20  accident, yes.

21  Q.    Now, with regard to impairment issues, you've reviewed the

22  medical reports, right?

23  A.    Correct.

24  Q.    You've reviewed the police reports?

25  A.    Correct.

1  Q.    Now, you've testified in state court before.  And I'm

2  going to assume that when you see police reports, that the

3  reports will indicate that a person maybe has blood-watery

4  eyes, correct?

5  A.    Correct.

6  Q.    That they had a smell of alcohol, correct?

7  A.    Correct.

8  Q.    And nystagmus issues, correct?

9  A.    Correct.  They don't talk about it in court, but they do

10 use that.  It's not allowed in -- at least when I left it

11 was -- most judges did not permit discussion of nystagmus in

12 the courtroom, but they still administered the test as part of

13 their diagnosis.

14 Q.    But at least when you review those reports you see

15 indications, when a person is being charged with involuntary

16 manslaughter or DWI, indicia of impairment, correct?

17 A.    Well, it depends.  If they've been in an accident and go

18 directly to the hospital, the officer doesn't have any chance

19 to do any of those tests.

20 Q.    But in this case the officer did have a chance to

21 interview Mr. Tsosie?

22 A.    I don't believe he was capable of doing, like, the

23 standard field sobriety tests.

24 Q.    I'm talking about the hospital.  He was interviewed.

25 There's reference to an exhibit of his interview, where he

1  disclosed that he drank three bottles and the last drink was at

2  11:00?

3  A.    Correct.

4  Q.    In your review of the reports, both medical and police,

5  there's no indication that Mr. Tsosie had any blood-watery

6  eyes, correct?

7  A.    I don't recall any notation, no.  I don't think so.

8  Q.    There's no indication that he smelled of alcohol, was

9  there?

10 A.    No, I don't believe I read anything about that.

11 Q.    No issues with regard to nystagmus, correct?

12 A.    Unless the doctor put "no nystagmus," I don't know what he

13 meant by that.

14 Q.    He said no nystagmus?

15 A.    Correct.

16 Q.    If a -- What would you -- If a person was impaired, would

17 you expect to see that?

18 A.    The field standards sobriety tests -- FFST's -- FS --

19 looked at -- are used to confirm higher BAC's, at .08 to .10.

20 There have been some studies indicating possible nystagmus

21 lower, but not really too many have addressed nystagmus at

22 lower BAC's.

23 Q.    But the notes indicate no nystagmus?

24 A.    Correct.

25 Q.    And part of the reason why a doctor would expect, or a

1  nurse would want to know whether a person is under the

2  influence of alcohol is because that will have an impact on the

3  medication they would prescribe, correct?

4  A.   Correct.  I believe it also indicates, in certain brain

5  injuries, they're looking for pathological reasons, ruling out

6  pathological reasons, also.

7  Q.   So it's important for them to know so that they can

8  properly administer medications?

9  A.   They're looking, like, for clinically significant

10  nystagmus.

11  Q.   And so with regard to at least what you've seen, there's

12  no indication, with regard to Mr. Tsosie -- those three

13  factors -- maybe other factors, but those three factors that I

14  just set forth, there's nothing that you saw?

15  A.   Correct.

16  Q.   But you're still -- your testimony is still that

17  Mr. Tsosie was impaired, even though there is no indication

18  with regard to any of those factors?

19  A.   The testimony is that alcohol impacts drowsiness and

20  exacerbates the problems associated with drowsiness driving,

21  the lane drifting, not being aware of how impaired they are.

22  Q.   I know I've asked this question before, and I apologize, I

23  don't want to draw an objection, but there was no evidence of

24  lane drifting with Mr. Tsosie, correct?

25  A.   I don't feel like I have the expertise to make that --

1    that evaluation.  The accident -- There was all kinds of stuff

2    about accidents, but I did not look at that.

3    Q.    Then let's make an assumption.  Assuming that he -- there

4    was no lane drifting in this case and there is no indication in

5    the reports, medical or police, with regard to any of those

6    factors, it's still your testimony that Mr. Tsosie was

7    impaired?

8    A.    His alcohol level was such that it would be impairing,

9    yes.

10   Q.    And --

11            MR. WINDER:  Can I have a moment, Your Honor?

12            THE COURT:  Yes, you may.

13   Q.  (By Mr. Winder)  You don't know what Mr. Tsosie's

14   metabolic rate is, do you?

15   A.    For alcohol?

16   Q.    Yes.

17   A.    No.

18   Q.    Let's talk about the factors with regards -- I'm going to

19   go back to retrograde extrapolation.  I don't want to promise,

20   but I think I might be done in the next 15 minutes or so.

21   A.    I won't get too excited.

22   Q.    Let's go ahead and talk about retrograde extrapolation

23   again.

24            What are the important assumptions and/or factors

25   that you take into account with regard to you conducting this

1  retrograde extrapolation in this case?

2  A.   In this case?  What they had to drink.

3  Q.   I'm sorry, I'm asking in general.  Not this case.

4  A.   That's what I was saying.  In general.  What they have to

5  drink, the time period that they had to drink it, when they

6  stopped drinking, whether they had food with it.  And right off

7  the top of the head that's the main things.

8  Q.   There's no other factors?

9  A.   That's all that comes to my mind right now.

10  Q.   Okay.  So given those factors that come to your mind,

11  maybe I'm wrong here, but there's at least two factors that you

12  were not aware of with regard to Mr. Tsosie?

13  A.   Right.  Also, the gender, of course.  You're going to look

14  at that.

15  Q.   Is weight a factor?

16  A.   And weight.

17  Q.   Now let's talk about Mr. Tsosie.  You know when he

18  stopped, but you don't know the time period, do you, when he

19  was consuming alcohol?

20  A.   No.

21  Q.   But that's an important factor, you just testified, with

22  regard to retrograde extrapolation.  You didn't -- You don't

23  know that here, correct?

24  A.   Actually, it -- due to the length of time between when he

25  stopped drinking and when the test was done and the accident,

1    it was not that relevant.

2    Q.    It was not that relevant.

3            What factors did you take into account, whether or

4    not this factor that you just set forth is relevant or not

5    relevant?

6            THE COURT:  Before you go into that issue, we need to

7    give Ms. Schutte a break.  We started at 1:30 before y'all came

8    in.  Would this be all right?

9            MR. WINDER:  Yes.  Thank you.

10           THE COURT:  All right.  We'll be in recess for a few

11   minutes.

12       (Court stood in recess at 3:17 p.m. and resumed at

13       3:32 p.m. as follows:)

14           THE COURT:  All right.  Ms. Drez, if you'll return to

15   the witness box again, I'll remind you that you're still under

16   oath.

17           Mr. Winder, if you wish to continue your examination

18   of Ms. Drez.

19           MR. WINDER:  Thank you, Your Honor.  May it please

20   the Court?

21           THE COURT:  Mr. Winder.

22   Q.  (By Mr. Winder)  Ms. Drez, we were going to go into one of

23   the issues that you -- factors that you take into account with

24   regard to retrograde extrapolation, and you set forth, I

25   believe, maybe four or five factors.

1   A.   Correct.

2   Q.   And over the break have you thought of any other factors

3   that you think you would want to have available to you?

4   A.   Not -- I think that's all I can think of.

5   Q.   Okay.  With regard to whether Mr. Tsosie had eaten, you

6   have no knowledge with regard to what he ate, do you?

7   A.   Correct.

8   Q.   You have no knowledge with regard to if he ate, when he

9   stopped eating, correct?

10  A.   Unless he ate after 11:00, no.

11  Q.   You have no idea what his weight is, do you?

12  A.   It's somewhere between 170 and 233 pounds.  The hospital

13  gave a weight of 233, and the detention center was 170, some --

14  probably somewhere in between there.

15  Q.   But one of the factors which you just testified that's

16  important is with regard to food consumption we're not aware

17  of?

18  A.   Correct.

19  Q.   Would it be also important to know whether a person is on

20  medications, as well?

21  A.    I believe most prescription medications, no, I don't

22  think.  I think there have been some studies with aspirin and

23  affecting the metabolism in the stomach, but nothing -- I can't

24  think of any medications -- normal medications that I've ever

25  run into as affecting the blood-alcohol level.

1 Q. And you say "some studies." Do you know what studies

2 those are?

3 A. I just -- I remember something about aspirin, but I

4 couldn't give you a quote on that right there.

5 Q. So you don't know anything else about painkiller

6 medication, whether painkiller medication could have an impact?

7 A. Well, painkilling medication can have a synergistic effect

8 or enhance the alcohol impairment, or you can say alcohol can

9 enhance, so, you know, as far as the impairment and the effects

10 on the abilities of the body to perform, I believe the only

11 thing that I remember in one of the courses I took that talk

12 about the NADH -- the normal metabolism -- but there are some

13 microenzymial systems that in -- will pitch in with high BAC's,

14 and there are some medications that interact with that

15 auxiliary -- I think they used to call them myos or something

16 like that -- that will react with those and can interfere with

17 that accelerated metabolism, but I'm not aware of any drugs

18 that actually have an effect or significant effect on the main

19 metabolism enzymes in the liver.

20 Q. You say "significant effect." Again, you -- That's what

21 you said, "significant effect." So are you testifying --

22 A. I would say -- I hesitate to say no effect, because I

23 don't know every single drug and down to that enzyme affect,

24 but in the 20 years that we've been doing blood alcohols for

25 the medical examiner it hasn't interfered with our analysis.

1    Q.    Now, you talked about enzymes.  But before I get into

2    that -- So there are -- There's at least one factor that you

3    were not aware of in addition to not knowing what Mr. Tsosie's

4    drinking pattern is, correct?

5    A.    There's one factor --

6    Q.    The factor -- You're not -- I'm sorry.  I thought it was

7    your testimony that you weren't sure exactly when Mr. Tsosie

8    stopped eating food.

9    A.    I don't have any information on if or when he ate any

10   food.

11   Q.    And you also have no knowledge of his drinking pattern?

12   A.    Correct.

13   Q.    So given that you don't have two important factors, one of

14   which Mr. Gannett says is important, how can you testify with a

15   reasonable degree of scientific certainty that Mr. Tsosie's

16   blood alcohol was between .08 and .09 when you don't have those

17   two factors?

18   A.    Well, I talk about a range, which addresses a possible

19   range due to possible drinking patterns.

20   Q.    But you're not aware of his drinking pattern?

21   A.    Correct.

22   Q.    And the study it makes reference to doesn't talk about a

23   pattern, it talks about a person's drinking pattern, correct?

24   A.    Correct.

25   Q.    And you don't have that?

1   A.   But, like I say, I address that by giving a range, which

2   encompasses the different drinking patterns of individuals.

3   For instance, he said that -- Jones said that the alcoholics in

4   his -- drivers which were more likely alcoholics had a higher

5   range, up to .03.

6   Q.   Let's talk a little bit about -- I believe on direct

7   examination that you had testified that Mr. Tsosie was in the

8   elimination phase.

9   A.   Correct.

10  Q.   How do you know that?

11  A.   That's based on the principle of the extreme length of

12  time between his last drink and his -- the test -- or even the

13  crash an hour before the test.  Study -- These two studies, and

14  several other studies, the maximum to reach the beginning of

15  elimination phase has been 120 to 130 minutes, or two hours.

16  Q.   Let's talk about the factors.  What factors do you take

17  into account to determine whether the person is in the

18  elimination phase?

19  A.   The factors?  Basically, I look at the length of time

20  between his last drink, and depending on what he had to drink,

21  I would estimate the peak anywhere from 30 minutes to an hour,

22  and depending on the factors of what he ate, extend that

23  possibly to two hours.

24  Q.   Anything else?

25  A.   As far as when the elimination phase?

```
1    Q.    Yes.

2    A.    Those would be the main factors.

3    Q.    So it's your testimony those are main factors?

4    A.    Correct.

5    Q.    So one of the main factors you're not aware of?  You don't

6    know what he ate, do you?

7    A.    I accounted for that by giving the benefit of the doubt

8    and making it two hours.

9    Q.    But you didn't have that information with regard to what

10   you've just testified, what's important with regard to

11   determining elimination phase, correct?

12   A.    Would you repeat that question once more?

13   Q.    One of the factors that you just set forth that would be

14   important in determination of the elimination phase you did not

15   have, right?

16   A.    I did not have, therefore, I extrapolated that -- or

17   surmised that it would be at least two hours before he began

18   the elimination phase.  If I had more information, I may have

19   made it a shorter time.  If he had had dinner at 6:00 and then

20   went to the bar and had three beers and stopped drinking at

21   11:00, I would have assumed an elimination phase earlier than

22   two hours after the accident.

23   Q.    Okay.  I want to get back to -- I know we discussed issues

24   with regard to blood samples, but I want to go into specifics

25   here.
```

1          A blood sample kit is used for forensic purposes,

2    correct?

3    A.    Correct.

4    Q.    And in this case there was no blood kit?

5    A.    Correct.

6    Q.    And the blood sample that was obtained was not received

7    based upon forensic procedures, correct?

8    A.    At least -- I don't know exactly.  It was probably based

9    on clinical procedures, which some may have coincided with

10   forensic procedures and some may have not.  Not knowing exactly

11   how the process was done, but -- I don't know.

12   Q.    Clinical procedures that you have no knowledge about, at

13   least at the Fort Defiance Indian Hospital?

14   A.    Correct.

15   Q.    And one of the important reasons why -- And you testified

16   earlier that with a blood kit one actually puts the blood --

17   Describe to me what type of instrument or device -- it's late

18   in the afternoon.  Where is blood put in a blood kit after the

19   blood is drawn?

20   A.    It's pulled in the vacuum tubes and then it's placed in

21   the kit.  The tube's sealed, and then the kit's sealed, and

22   then it is sealed, and they either hand-deliver it to the

23   laboratory or it's mailed.

24   Q.    Why is it important that the tube -- It's a vacuum tube?

25   Why is that important?

1    A.   It just facilitates drawing -- Like drawing any blood, you

2    want a vacuum tube.  That's how they draw blood.

3    Q.   I thought that there may be importance for it.

4    A.   That way they don't have to use a syringe and pull it out.

5    It facilitates --

6    Q.   Why is it sealed?

7    A.   Why is the kit sealed --

8    Q.   Yes.

9    A.   -- after it's collected?

10   Q.   Yes.

11   A.   Particularly if it's going through the mail, for the chain

12   of custody.

13   Q.   Do you have any knowledge whether there was a vacuum tube

14   used in this case?

15   A.   Probably -- I probably -- Probably was.  I did not witness

16   the blood, so I don't know for sure.

17   Q.   Do you have any knowledge -- You don't have any knowledge

18   whether or not that blood sample was sealed when it went from

19   the Fort Defiance Hospital to law enforcement, correct?

20   A.   I don't know if I understand what you're asking.

21   Q.   I assume the reason why it's sealed is because of chain of

22   custody.  You don't -- You want to make sure that that --

23   A.   Are you speaking of the tubes collected for the forensic

24   kits?

25   Q.   Yes.

1  A.   Oh, okay.  I thought we were still in the hospital.

2          They're sealed, right, to preserve the integrity of

3  the sample --

4  Q.   Why is -- I'm sorry.  Go ahead.

5  A.   -- so that when it comes to the lab we know that no one

6  has tampered with it.

7  Q.   Why is it important to preserve the integrity of the

8  sample?

9  A.   It's chain of custody.

10  Q.   Now, I made the assumption that -- and maybe it was

11  incorrect -- that -- Let me withdraw this question and ask you,

12  do you have any knowledge as to how the blood sample was

13  transmitted from Fort Defiance Hospital to law enforcement?

14  A.   The actual blood sample?

15  Q.   Yes.  Because there's no blood kit here.  I'm just -- How

16  was this sample transmitted to law enforcement?  Do you know?

17  A.   I don't know if it was transmitted to law enforcement.

18  Q.   So you don't -- You don't know where it was transmitted

19  to, basically?

20  A.   It must have -- Other than going to the laboratory to be

21  analyzed.

22  Q.   Okay.

23  A.   Because it was a result.  Yes.

24  Q.   Well, with regard to the blood sample that was taken --

25  A.   Correct.

1    Q.    -- on the date of the accident, do you have any

2    independent knowledge with regard to whether that sample was

3    preserved with integrity?

4    A.    Other than whatever the hospital procedure is, but I don't

5    know what their procedure is.

6    Q.    Now, we've talked about enzymes.  What is an enzyme?

7    A.    It's biological compounds that help reactions in the body.

8    Q.    Okay.  What is alcohol dehydrase?  What is that?

9    A.    That's involved in the metabolism of alcohol.

10   Q.    Now, earlier you testified that we made the assumption

11   that rubbing alcohol might have been used when that heplock was

12   placed on Mr. Tsosie.  Correct?

13   A.    It could be possible, correct.

14   Q.    And you -- And I don't want to mischaracterize your

15   testimony, but I believe it is your testimony that that rubbing

16   alcohol, you didn't take that into account with regard to your

17   extrapolation.  Correct?

18   A.    I used the value of the test for my extrapolation.

19   Q.    Did you take into account that rubbing alcohol might have

20   been used on Mr. Tsosie?

21   A.    I didn't consider it, no.

22   Q.    Do you think that might have been important?

23   A.    No.

24   Q.    Why?

25   A.    Because particularly in the -- the kits we had nonalcohol

1    swabs just so that we didn't have to argue about it, but there
2    have been lots of experiments, and usually they can't get any
3    result or they got a below-the-radar result, in other words,
4    like three decimal places.  Remember, the alcohol, we usually
5    only report to two decimal places, and it's just not an
6    appreciable factor.  With a sensitive enough instrument, you
7    might notice a trace amount, but it's usually not relevant.  I
8    think if it interfered radically with the alcohol test, the
9    hospital wouldn't be using it.
10   Q.    Okay.  I will not go into Dr. Reyes's report.  You've seen
11   his report, correct?
12   A.    Correct.
13   Q.    And he's made some assumptions with regard to that,
14   correct?
15   A.    Correct.
16   Q.    So you're just both in disagreement?
17   A.    Correct.
18   Q.    With regard to -- I'm about finished here.  Thank you for
19   your indulgence with me, Ms. Drez.
20          In your recent report that you provided to the U.S.
21   Attorney's Office and to me -- received -- you set forth -- Let
22   me just preface this with a question.  We've asked it several
23   times.  You don't know -- You have no independent knowledge of
24   when the blood sample was taken.  It could have been taken
25   immediately upon his arrival, but you don't know with

1  certainty, correct?

2  A.   I just know what I've been told, yes.

3  Q.   What you've been told, but there's nothing in the reports

4  indicating when that blood sample was taken?

5  A.   Nothing that specifically gives a time for the blood

6  collection.

7  Q.   And a heplock -- We've talked about what heplock is.

8  That's not necessarily used to obtain a blood sample, correct?

9  A.   Correct.

10 Q.   It's used for other purposes, as well?

11 A.   Correct.

12 Q.   Now, the accident -- do you have your notes in front of

13 you -- occurred sometime, you say, at 5:11 or so?

14 A.   Correct.

15 Q.   But you have no independent knowledge when the collision

16 actually occurred, do you?

17 A.   I assume it was before 5:11.

18 Q.   But you don't know exactly when it might have occurred?

19 A.   Correct.

20 Q.   Okay.  And so Mr. Tsosie was transported to the hospital,

21 along with the victims.  And what time did he arrive?

22 Mr. Tsosie.

23 A.   Tsosie was 5:59, yeah.

24 Q.   5:59.  So if the -- Hypothetically, if the blood sample

25 was taken soon thereafter of his arrival --

1    A.    Correct.

2    Q.    -- in your report of April 14th, you state -- I'm just

3    looking at the bottom of the page -- as discussed in the July

4    2010 opinion, an undeniable conclusion is that one -- is that

5    whether one accepts a BAC of .07 taken within one hour of a

6    crash or accepts the extrapolation that Mr. Tsosie basically

7    was 0.04 -- 0.09 at the time of the crash, Mr. Tsosie was

8    impaired by alcohol."

9         I want to break this down.  In your statement in your

10   report, you set forth that there is an undeniable conclusion as

11   to whether or not one should accept his blood alcohol of 0.07,

12   correct?  That's what's in the report?

13   A.    Could you repeat that question?

14   Q.    In your report, you say, "whether one accepts an

15   undeniable conclusion" -- those are your words, "an undeniable

16   conclusion is that whether one accepts a BAC of 0.07 taken

17   within one hour of the crash."  That's what your report says,

18   correct?

19   A.    Correct.

20   Q.    And we already had testimony that you have no independent

21   knowledge as to when the blood sample was taken, correct?

22   A.    Correct.

23   Q.    And so if that blood -- If a blood sample was taken at

24   6:01, which is within one hour of the crash, which you just

25   testified you believe might have occurred shortly before 5:11,

1  your statement here is that there is an undeniable conclusion

2  that his blood level could have been .07?

3         MR. BAKER:  Objection, Your Honor.

4  A.   No, that's not --

5         THE COURT:  Overruled.

6  A.   I don't believe you're reading the sentence correct or I

7  didn't convey it.  I think what you -- That's a "whether."  The

8  undeniable conclusion is that Mr. Tsosie was impaired by

9  alcohol, and I reached that conclusion whether I -- you want to

10  just accept that his BAC was at .07 at the time of the test and

11  don't do extrapolation or whether you even look at the

12  extrapolation and his BAC was .08 or .09, the alcohol level

13  indicates that Mr. -- was at a level -- that Mr. Tsosie would

14  be impaired by alcohol.

15  Q.   Well, I'm just trying to say, because at the beginning of

16  cross-examination I made reference to your July 1st report, and

17  you testified -- maybe I'm wrong or I misheard, because I asked

18  you a few times -- that Mr. Tsosie's blood-alcohol level could

19  have been .07 at the time of the crash.

20  A.   I said no lower than.

21  Q.   No lower than.  Meaning it could have been .07?

22  A.   It's not very likely, but you could interpret it that way

23  if you wished.

24  Q.   Let's talk about it.  It's not very likely?  I'm not

25  interpreting this.  I'm just looking at your report, ma'am.

1   I'm not the expert here.  I just want to firm up.  You said

2   it's very not likely.  So what are the factors that you would

3   take into account whether it's likely or not likely?  You said

4   "very likely."

5   A.    Due to the extreme length of time between the drinking

6   stopping and the crash, there was, I would say, virtually no

7   possibility that his BAC was lower than .07, and the more

8   reasonable or scientific reasonable value would be higher than

9   .07, an .08 or .09.

10  Q.    Well, you used the term "very likely."

11  A.    Correct.

12  Q.    That's not a scien- -- Is that a scientific term, "very

13  likely"?  If someone's going to get an MRI, is that term "very

14  likely" going to be used, or is a doctor going to use some

15  other term?

16  A.    I could see him saying, "We very likely could find a tumor

17  based on his symptoms."

18  Q.    So very likely -- I guess we're splitting hairs here, but

19  your testimony is that it's not very likely, but his

20  blood-alcohol level could have been .07 at the time of the

21  collision, correct?

22  A.    It couldn't be any lower.

23  Q.    My question is not any lower.  It could have been .07?

24  A.    If you want to look at two digits, it's possible.

25  Q.    So it's possible that his blood-alcohol level could have

1  been between .07 and .09?

2  A.   I guess you could say anything was possible.  It's not

3  likely.  And, actually, the longer the test -- the further away

4  the test was from the actual time of the crash, the more

5  reasonable interpretation is that it was higher.

6  Q.   So you say "reasonable interpretation."  Given the fact

7  that you say it's very likely, do you think those factors,

8  which you didn't include with regard to retrograde

9  extrapolation, you set forth those factors you think are very

10  important, and I set forth that factor which is set forth in

11  the report from Dr. Gannett.  You didn't include that.  You

12  don't have any idea what his drinking pattern was.  So you're

13  testifying -- Even though you didn't have two important

14  factors -- one factor, Mr. Tsosie's drinking pattern; second

15  factor, you have no knowledge of what he ate before the

16  accident.  So you're saying that it's very likely that his

17  blood alcohol could have been -- was .08 or above?

18  A.   More likely, yes.

19  Q.   But it could have been .07.  I just want to finish up here

20  with regard to -- I don't want to mischaracterize your

21  statement here, ma'am, with regard to your report.  That's not

22  my intent.  My intent is just to analyze and look at what

23  you've set forth in your report.  And I'm looking at this

24  language and tying it in to this July 1st report.

25           So my question is that you say an undeniable

1   conclusion is that whether one accepts -- So my question is,

2   you said whether one accepts, so -- You use that language.  Why

3   would one accept that .07, based upon your knowledge and

4   experience?

5   A.   Well, impairment is indicated if you just look at the

6   blood test that was done one hour after the crash or if you

7   extrapolate back to what the BAC was at the time of the crash.

8   The alcohol level, particularly the degree of impairment, is

9   not going to be that much different for a .07 or .08 or .09 for

10  any individual.  It's going to be a -- probably a fine line.

11  The main factor is, that is the alcohol level sufficient to

12  impair driving.  All the studies have shown that.  And

13  particularly in combination with drowsiness, the alcohol would

14  have contributed to the drowsiness a significant amount.

15  Q.   Well, I'm just looking at your report, and I see here that

16  you say that "whether one accepts an undeniable conclusion

17  whether one's BAC is .07 taken within an hour of the crash."

18  That's what your report says, your supplemental report.  And it

19  goes on further, but that's what your report does say, if one

20  accepts that?

21  A.   Perhaps my English was not sufficient, but the intent of

22  the sentence was that the conclusion is Mr. Tsosie -- You could

23  read it either way.  If I could have reworded it, my conclusion

24  is that Mr. Tsosie was impaired by alcohol whether one accepts

25  the BAC of .07 or at .08, 09.  That may be -- That's maybe --

1   That's why I'm a chemist and not an English teacher.

2   Q.   This is going to be my second-to-last question.   Okay?

3   A.   Sure.

4   Q.   Given that there was no factors -- and those factors which

5   I'm looking at are indications of blood-watery eyes, the odor

6   of alcohol or nystagmus.   Given that there's nothing in the

7   reports that you would normally see in a person who's driving

8   while intoxicated, and those factors which you said are

9   important with regard to retrograde extrapolation, my question

10  is, how can you testify -- and, moreover, if you don't know

11  when the blood sample was taken, you don't know the procedures

12  that the Fort Defiance Hospital takes into account with regard

13  to the integrity of the blood sample, how can you testify as an

14  expert with a degree of reasonable scientific certainty that my

15  client was impaired?

16  A.   I'm basing it on the .07 blood alcohol.   That's the

17  information that was furnished to me.   That's what my decision

18  is -- my opinion is based on that information.

19            MR. WINDER:  May I have a moment, Your Honor?

20            THE COURT:  You may.

21            MR. WINDER:  No further questions.

22            Thank you, Mr. Winder.

23            Mr. Baker, do you have redirect of Ms. Drez?

24            MR. BAKER:  Yes, Your Honor.

25            THE COURT:  Mr. Baker.

1       REDIRECT EXAMINATION

2   BY MR. BAKER:

3   Q.   All right.  Ms. Drez, to start off, I want to -- I want to

4   talk more about the distinction between absorption and

5   elimination rate.  Your chart, as you've acknowledged, doesn't

6   trace the whole curve, correct?

7   A.   Correct.

8   Q.   Is this in a really ugly fashion -- since I'm no artist --

9   a reflection more like what the curve would have looked like if

10  you had drawn it going forward, with the far left side

11  reflecting the start of alcohol consumption up to a peak and

12  then a long elimination rate that's reflected on your chart?

13  A.   Correct.

14        MR. WINDER:  I object, Your Honor.  I don't think

15  this was in her report, so, I mean --

16        MR. BAKER:  Your Honor, I can clarify the -- There's

17  been a point made that the chart that she made is inadequate.

18  She can certainly explain what the full chart would look like

19  if she put a curve on it.  The only point that I'm making is

20  that this disagreement over whether it's a curve or a line is a

21  reflection of how narrowly focused in the chart was when it was

22  created, not a reflection of failure to account for an

23  important variable.

24        THE COURT:  Well, I'll allow her to explain.  We can

25  decide later on whether she can testify on this.  I'll allow

1  the explanation today as part of the Daubert hearing.

2  Q.  (By Mr. Baker)  If you had drawn the entire curve, is that

3  what it would have -- approximation of what it would have

4  looked like?

5  A.    Something -- Something to that effect.  One of the

6  problems would be that -- We talked about if Mr. Tsosie had

7  three beers and an approximate BAC.  That just doesn't

8  accommodate, actually, a good curve, because he would have gone

9  up a little bit and come down.  But that's -- That's

10 essentially -- You're correct, that's what we would be looking

11 at.

12 Q.    And, Ms. Drez, food, does that go to absorption or

13 elimination?

14 A.    That goes to absorption and how long you maintain a peak.

15 So that would be a -- Like you've got sort of a flat area.

16 That would -- That might be -- influence -- The length of that

17 would be influenced by food.

18 Q.    Would that influence the two-hour window that you said you

19 gave Mr. Tsosie before you even put him into elimination?

20 A.    Correct.  This would all be within the -- This would be

21 the two-hour window.

22 Q.    If Mr. Tsosie had a steak dinner, would he still have

23 entered the elimination within a two-hour window?

24 A.    Yes.

25 Q.    If Mr. Tsosie ate nothing, would he still have entered

1  elimination within the two-hour window?

2  A.   Correct.  It would probably have started -- the line would

3  have gone up sooner.

4  Q.   If he had just vegetables for dinner, still two hours?

5  A.   Correct.

6  Q.   So when Mr. Winder asked you to talk about factors that

7  you take into consideration in a general case, is this the

8  general case that you normally saw as an employee at the

9  Department of Health, in terms of timing?

10 A.   Correct.  And because sometimes the amount of alcohol

11 that's stated is not consistent with the data -- with the

12 amount of alcohol -- the amount of alcohol in the test.

13 Q.   In determining that you were going to start the

14 elimination rate at 1:15 a.m., did you take into consideration

15 what Mr. Winder called the curve?

16 A.   Correct.

17 Q.   And that's by giving him two hours to get to elimination?

18 A.   Correct.  This would be when the curve had started to come

19 down.

20 Q.   Now, with regard to -- With regard to other factors, such

21 as Mr. Tsosie's exact weight, would he still -- regardless of

22 his weight, as a human being would he enter the elimination

23 phase within two hours?

24 A.   Correct.

25 Q.   Regardless of his gender, would he have entered the

1 | elimination --

2 | A.   Women tend to start eliminating faster, so it might have

3 | been sooner, but, generally, I don't take that into

4 | consideration.  I kind of go by the general two hours.

5 | Q.   So by picking a start time of 1:15 a.m., did you take into

6 | consideration the factors that could have influenced

7 | differences in human beings regarding whether they would start

8 | eliminating?

9 | A.   Correct.  That's also addressed in having a range.

10 | Q.   Now, there was a discussion of the Gannett, and I would

11 | ask you to turn to that -- that's Exhibit D-1-E -- and that

12 | second page -- paragraph, and I want you to look at that

13 | paragraph and tell me whether that is a discussion of

14 | determining a point where you would shift from absorption --

15 | Let me say it differently.  Is that paragraph talking about

16 | determining the absorption rate?

17 | A.   Correct.  In the abstract, are we talking about, or in --

18 | Q.   Page 138 on the second page.  It's the paragraph that

19 | Mr. Winder asked you to look at that starts, "In order for the

20 | expert witness to be able to assess" --

21 | A.   "[w]hether the individual's BAC would high been rising or

22 | falling at the time of incident, the expert must have knowledge

23 | about the effects that an individual's drinking pattern would

24 | have."  Okay.  Right.

25 | Q.   So would your two-hour assumption regarding when the shift

1  of elimination would have occurred deal with drinking pattern?

2  A.   Right.  Correct.

3  Q.   It would accommodate for either a fast drinking pattern or

4  a slow drinking pattern, correct?

5  A.   Correct.

6  Q.   And it would account for how much total alcohol he

7  consumed before reaching the elimination phase, correct?

8  A.   Correct.  And that's why in the abstract when they're

9  talking about the difference in when they achieve their maximum

10  and the end of drinking or the start of linear decline was 69

11  minutes.  So that was even -- And the range was zero to 124

12  minutes.  That's what he saw with these different individuals

13  drinking -- different drinking patterns, drinking different

14  drinks and different rates.

15  Q.   And your start time is two hours -- actually, two hours

16  and 15 minutes after --

17  A.   Correct.

18  Q.   -- the stated time of ceasing of consumption?

19  A.   Correct.

20  Q.   Now I want to focus in just on this part of the chart

21  here.

22  A.   Correct.

23  Q.   For purposes of extrapolating from the time of the blood

24  draw at 6:15 to the time of the crash --

25  A.   Correct.

1  Q.    -- if I understand this right -- and I'm not in your

2  position -- but the only way the shape of that line would

3  change is if somehow Mr. Tsosie was still in the absorption or

4  plateau phase, correct?

5  A.    Correct.

6  Q.    Because it's linear when he's in elimination?

7  A.    Correct.

8  Q.    So putting that into the context of the chart as a whole

9  and the knowledge you have of when Mr. Tsosie stopped drinking,

10 unless he was in absorption or plateau for seven hours -- six

11 hours --

12 A.    Correct.

13 Q.    -- that chart -- that line's going to look exactly the

14 same?

15 A.    Correct.

16 Q.    Would you look at Exhibit D-1-A -- wait, no, let me see

17 here -- D-1, your original July 1st, 2010, report.

18 A.    Correct.

19 Q.    The second page --

20         Let me focus in on this.

21         The part that I've circled from the .07 to .08 to

22 .09 --

23 A.    Correct.

24 Q.    -- that's the same line that's drawn and reflected on your

25 later chart that we've been looking to here, correct?

1   A.   Correct.

2   Q.   The only difference is that you've moved it 15 minutes to

3   reflect a 6:15 blood draw, rather than a 6:00, correct?

4   A.   Correct.  Correct.

5   Q.   So your opinion hasn't changed, correct?

6   A.   Correct.

7   Q.   Is it possible that if -- taking Mr. Tsosie's statement as

8   to when he stopped drinking, that he would have been in

9   absorption or plateau anywhere near the time of the crash

10  still?

11  A.   No.  No.

12  Q.   And why don't the absorption factors, that Mr. Winder

13  spent a lot of time talking to you about, impact your analysis

14  in this case?

15  A.   As I say, the key was the length of time between the last

16  reported drink -- I did have that information -- and when the

17  crash occurred and the blood alcohol was obtained.

18  Q.   I'm going to put out a scenario for you.  Somebody goes

19  out to drink, goes out on a night of drinking, leaves the bar,

20  gets into a crash on the way home from the bar.

21  A.   Correct.

22  Q.   Is that a more typical case, in terms of what you saw at

23  the Department of Health as you did retrograde extrapolation,

24  as compared to a crash that occurred six hours after ceasing?

25  A.   Correct.  Then, in particular, you need to determine what

1    their habit of drinking, what did they have to drink, what were

2    they eating, when was their last drink.  All that information

3    is extremely important and can affect the range of this -- you

4    should just put up this area, the peak.  It could prolong it

5    and make it -- Correct.

6    Q.    You're normally doing your extrapolation based on this

7    window here, correct?

8    A.    Correct.

9    Q.    Roughly?

10   A.    Correct.  But there was such a long time from the time of

11   the crash, and to make it easier to read the graph, I just

12   focused on the pertinent information, the last few hours before

13   the crash and the time of the crash.

14   Q.    Briefly about blood kits and the hospital's procedures.

15   Blood kits are if a blood sample is taken for law enforcement

16   purposes?

17   A.    Correct.

18   Q.    Why would you assume that blood's being drawn in a

19   hospital?

20   A.    Because -- You mean, for the forensic kits?

21   Q.    No, not for forensic kits.  If somebody comes into the

22   hospital for medical treatment, why do you think the medical

23   personnel are doing a blood draw and testing?

24   A.    Oh, when they come to the emergency room, the first thing

25   they know, they test for drugs and alcohol, because they need

1  to know what chemicals the -- what drugs the person has on

2  board before they begin administering medication and help

3  determine what signs may be from -- of impairment or psychosis

4  or whatever may be from drugs that they have taken versus a

5  pathological conclusion.  So it's a diagnostic tool for them.

6  Q.   In your experience, have you ever seen a hospital that has

7  no protocols to keep samples clean?

8  A.   It's extremely important to -- It's a matter of life and

9  death in the hospital, as far as making sure that you're doing

10  the test on the right patient and getting the right results,

11  because it could be a life situation at that point.  So I

12  assume they have strict methods for ensuring the integrity of

13  the sample.

14        MR. BAKER:  Your Honor, I'm just going to gather my

15  thoughts real quick.  I think I'm about done.

16  Q.   With regard to impairment, you reached the conclusion that

17  Mr. Tsosie was, in fact, impaired.  Did you see Mr. Tsosie's

18  statement, that he fell asleep at the wheel, as corroborating

19  or calling into question your conclusion that he was impaired?

20  A.   It indicated to me that alcohol -- well -- would play a

21  part in the falling asleep.  That would be a symptom of

22  impairment.

23  Q.   With regard to the studies you saw related to the Native

24  Americans and the metabolism of alcohol, did you see any of

25  those studies that suggested Native Americans regularly are

1  processing alcohol below .01 an hour?

2  A.    No.

3  Q.    Were the studies within a range of .01 or .02?

4  A.    Or higher.

5  Q.    Or higher?

6  A.    Or higher.

7  Q.    If somebody had accelerated metabolism, would that have

8  pushed the line on Exhibit D-2-A up and led to a higher BAC at

9  the time of crash --

10  A.    Correct.

11  Q.    -- or down?

12  A.    Correct.

13  Q.    Higher?

14  A.    Higher, right.  It would have been a steeper -- The slope

15  would have been steeper.

16            MR. BAKER:  I don't have anything further, Your

17  Honor.

18            THE COURT:  All right.  Thank you, Mr. Baker.

19            All right, Ms. Drez, you may step down.  Thank you

20  for your testimony.

21            THE WITNESS:  Thank you.

22            THE COURT:  All right.  Does the United States have

23  any further witnesses or evidence on this motion, Mr. Baker?

24            MR. BAKER:  No, Your Honor.  Just argument.

25            THE COURT:  All right.  And, Mr. Winder, do you have

1   any evidence or witnesses you would present on this motion?

2          MR. WINDER:  No, Your Honor.  Thank you.

3          THE COURT:  All right.  Well, if you wish to argue in

4   support of your motion, then, the Daubert motion portion of it.

5          MR. WINDER:  Yes.  Would you like me to go first,

6   Your Honor?

7          THE COURT:  Yes.

8          MR. WINDER:  Thank you.

9          Your Honor, may it please the Court?

10         THE COURT:  Mr. Winder.

11         MR. WINDER:  Thank you.  I wanted to thank

12  Mr. Nayback for bringing this case to my attention, New Mexico

13  versus Day, because New Mexico versus Day I read over lunch,

14  and I think it's a very important decision.

15         THE COURT:  Where does it kind of leave us?  Do you

16  agree that you can have this extrapolation, this retrograde

17  extrapolation in New Mexico under the influence cases still

18  there?

19         MR. WINDER:  I believe that's correct.  And I'm glad

20  that we had this Daubert hearing, because I think -- Well, my

21  argument is going to be that Ms. Drez's testimony fails under

22  New Mexico versus Day.

23         THE COURT:  Well, let me -- Let me ask you a series

24  of questions before we get to that point.

25         So you have -- You have no objection to the original

1  basis for the motion of -- the legal one, that it's irrelevant?

2  You don't raise that issue anymore?

3          MR. WINDER:  That's correct.

4          THE COURT:  You believe it's legally relevant?

5          MR. WINDER:  Yes.

6          THE COURT:  And is -- Do you also agree that the

7  retrograde extrapolation is a -- is a test that's widely

8  accepted within the scientific community and that there's --

9  that it's a valid methodology?

10          MR. WINDER:  Yes, Your Honor.

11          THE COURT:  All right.  And so your objection now is

12  the way that Ms. Drez applied that methodology in this case,

13  correct?

14          MR. WINDER:  Yes, Your Honor.

15          THE COURT:  And list for me all the problems that you

16  think from a Daubert standpoint -- I'm trying to -- I'm trying

17  to -- I'm trying to separate out sort of cross-examination

18  material from real Daubert issues.

19          MR. WINDER:  First of all, Your Honor, I think that

20  there were several studies which Ms. Drez made reference to,

21  and I would like an opportunity to review those studies.

22  Specifically, those relating to medication, those relating to

23  whether or not -- Mr. Baker did a good job on redirect with

24  regard to absorption and elimination.

25          I would like to -- One area that I would like to

1  focus on is the issue with regard to what the Court, at least

2  in Day, set forth, Your Honor, with regard to scientific

3  retrograde extrapolation evidence, Your Honor.

4          THE COURT:  Well, what are -- What are the -- What

5  are those reports going to show you that go to a Daubert-type

6  issue?

7          MR. WINDER:  Well --

8          THE COURT:  It seems to me that they might help you

9  cross-examine her at trial and show weaknesses in her testimony

10  or in her opinion, but are they going to -- are they going to

11  get us to the point where we're either going to exclude her or

12  limit her testimony?

13          MR. WINDER:  Your Honor, I'm just looking at what

14  Mr. Nayback pointed out to this Court and myself prior to

15  lunch.  And I don't know whether Your Honor has had an

16  opportunity to read the Day decision.

17          THE COURT:  I haven't, so --

18          MR. WINDER:  Well, I have looked at portions of the

19  decision, specifically the paragraph which Mr. Nayback pointed

20  us out to, and I will read the salient paragraph into the

21  record for the Court's benefit.

22          There are two situations that the State can use

23  scientific retrograde extrapolation that's set forth in

24  paragraph 30.  And paragraph 31, the Supreme Court has

25  indicated the party seeking to prove a BAC in earlier time must

1    use scientific retrograde-extrapolation evidence.  A BAC test

2    is a quantitative measurement of a physical property.  To

3    extrapolate the BAC at the time of testing to the BAC at an

4    earlier time, one must know the rate at which the BAC changes

5    over time.

6            And the Court cites to another New Mexico Court of

7    Appeals case, Christmas.  The Court further says, "The rate is

8    not constant but varies overtime, describing a curve, rather

9    than a straight line.  Determining the shape of the curve is a

10   science.  And then the Court sets forth a treatise written by

11   Jim Frazier, annotation, "Admissibility and Sufficiency of

12   Extrapolation Evidence in DUI Prosecutions," and Ms. Drez has

13   indicated that she is not aware of this.

14           THE COURT:  That sounds to my ear -- and correct

15   me -- is just cross-examination material.  It's not going to

16   cause us -- because she didn't hear another -- didn't know

17   about a report or didn't look at it, it doesn't sound like

18   something that's going to get us to the point of excluding her

19   testimony.

20           MR. WINDER:  Can I go further, Your Honor?

21           "The exact shape of the curve depends on a number of

22   factors, including, inter alia, the type of alcohol consumed,

23   the time period in which the alcohol was consumed, the time of

24   last drink, and when and what the defendant last ate.  These

25   factors can be quantified, although sometimes the supporting

1    evidence may not be ready available.  However, the burden" --

2    and I underscore "the burden" -- "the burden of finding such

3    evidence appropriate for the State to bear when attempting to

4    convict a person suspected of any crime, and should the State

5    choose to pursue a per se DWI conviction, it must take the type

6    of investigatory work required to prove a defendant's guilt

7    beyond a reasonable doubt."

8           Given those factors, I believe Ms. Drez does not

9    provide those facts which the New Mexico Supreme Court has said

10   is the burden of the United States.  So as a result of this

11   decision, I believe Ms. Drez cannot testify with regard to

12   reasonable degree of scientific certainty that Mr. Tsosie's

13   blood-alcohol level was between .08 and .09, Your Honor, when

14   the Supreme Court has indicated factors -- and I know that

15   we'll probably -- we may have to brief this issue -- issues in

16   regard to absorption and elimination issues, but at least my

17   reading of this decision is that the burden's on the State --

18   in this case the United States -- and I believe they failed,

19   Your Honor.

20          THE COURT:  All right.  Thank you, Mr. Winder.

21          Mr. Baker.

22          MR. BAKER:  So, Your Honor, most of the factors under

23   Rule 702 are not in dispute here.  Mr. Tsosie has made no

24   challenge to whether the subject matter of this testimony would

25   assist the trier of fact, no challenge to whether she's

1  qualified, no challenge to whether retrograde extrapolation is

2  a valid scientific approach.

3          So really we're getting down to this issue is -- the

4  question to me seems to be, does Nancy Drez make reasonable

5  assumptions based on the evidence available to her such that

6  her opinion is reliable?

7          Day did not set forth an exhaustive list of

8  everything that the State has to prove in every case, and when

9  you look at the curve and you look at the science that Ms. Drez

10  described, there is a valid basis for the assumptions that she

11  made.  She gave Mr. Tsosie the benefit of the doubt at every

12  turn, including giving him a two-hour window before reaching

13  absorption.

14          And on redirect she further explained that even if

15  you push way down the line, to six hours, he's still in

16  elimination before this accident occurs, and so factors such as

17  what Mr. Tsosie ate, how fast he drank however much alcohol he

18  drank, those types of things are not important in this case as

19  to the reliability of her opinion.

20          Sure, Mr. Winder can cross-examine her about it, and

21  I think that most of the -- well, really, all of the

22  cross-examination today is just that, but it does not go to

23  whether she has satisfied Rule 402 and should go through the

24  Court's gatekeeping function and be allowed to testify.

25          There's not a laundry list when you have this long of

1    a window, because elimination rate as Ms. Drez testified, when

2    you're in elimination, you're dealing with linear decline.  So

3    the curve dispute is really just a matter of how you display

4    the information that Ms. Drez already took into consideration

5    in reaching her opinions.

6          In the same vein, with regard to the blood sample,

7    experts rely on hearsay all the time.  They're allowed to rely

8    on hearsay.  And the burden to satisfy Rule 702 is that there

9    is a basis in the record for the assumption that Ms. Drez has

10   made, and a communication directly with the person who drew the

11   blood establishes that.

12         So for purposes of what we're looking at, this narrow

13   window of a one-hour extrapolation back, you've got the 6:15

14   blood draw based on the heplock medical record, combined with

15   Gayla Bias's statements directly to Ms. Drez.  We will prove

16   that up at trial, because Gayla Bias is on our witness list and

17   will, in fact, be called.

18         In addition, we will have the person from the

19   hospital who did the lab test to talk about protocols and the

20   like.  So this isn't uncommon.  An expert isn't present when

21   the events that they're testifying about occur.  Otherwise,

22   they'd be a fact witness.  They take data and information that

23   they learn from the record, they apply it, and then at trial

24   you set the table for the jury and you put this in front of

25   them.  That's what we're going to go through with Gayla Bias,

1   and that's what we'll do through the person that did the lab
2   technical work.

3       So you've got the 6:15 blood draw, and all Nancy Drez
4   has assumed to get back to the .08 to .09 is the very
5   conservative assumption that seven hours after he stopped
6   drinking Mr. Tsosie was in elimination -- that's one -- and
7   that Mr. Tsosie is not an outlier; that, like the general
8   population, he processes alcohol at a rate of .01 to .02
9   elimination, or even she could have gone higher and assumed
10  that he was a heavy drinker and offered up a line that was
11  based on a .03 elimination rate, but again she made
12  conservative estimates airing on the side of Mr. Tsosie in
13  reaching her points.

14      So we don't have an expert out on the limb in this
15  case.  We have an expert making the types of assumptions that
16  are regularly made when you're offering retrograde
17  extrapolation.

18      And I would point the Court to State versus Hughey, a
19  2007, New Mexico Supreme Court case.  It's 142 New Mexico 83.
20  Because there the Court allowed testimony by a toxicologist
21  where, like Ms. Drez, some assumptions had to be made.  There,
22  in some ways, the assumptions were much looser than Ms. Drez's
23  assumption.  They included that the defendant had been drinking
24  over a period of time.  Ms. Drez didn't have to assume one way
25  or the other how fast or slow Mr. Tsosie was drinking and that

1  he did not drink after the accident.

2         Well, here, Mr. Tsosie was taken directly to the

3  hospital.  There wasn't opportunity for him to drink after the

4  accident.  And consumption after the accident before the test,

5  obviously, is something that could skew the results that would

6  need to be taken into consideration.  But in Hughey the Court

7  reversed the lower court for having excluded that testimony.

8  And given that case and given the very particular information

9  and science that Mr. Drez has put before the Court today,

10 there's no basis for excluding her under Rule 702.

11        We'll gladly submit her under the crucible of

12 cross-examination at trial, but there's not a 702 problem here.

13        THE COURT:  All right.  Thank you, Mr. Baker.

14        Mr. Winder?

15        MR. WINDER:  Thank you, Your Honor.  May it please

16 the Court?

17        THE COURT:  Mr. Winder.

18        MR. WINDER:  I'd just point out for the record, Your

19 Honor, the case that Mr. Baker sets forth in 2007, a case of

20 New Mexico versus Day, is 2008.  So the most recent

21 pronouncement from the New Mexico Supreme Court is what I just

22 set forth with regard to retrograde extrapolation.

23        Now, the issues that I asked on cross-examination may

24 go to weight with regard to Ms. Drez's analysis, but I just

25 want to remind the Court that in -- even though it was

1    challenging -- and I apologize to Ms. Drez asking the question

2    several times, but at least in her report July 1st, and even in

3    her most recent report, there is an indication that

4    Mr. Tsosie's blood-alcohol level could have been .07 -- not

5    likely, but .07, given the fact that we have no idea today when

6    that blood draw was taken.  We don't know the integrity of the

7    process of the procedures that were in place.

8          Your Honor, this is obviously a very, very tough case

9    for the victims' family and Mr. Tsosie's family, but in this

10    case, where the United States has the burden, when they have

11    two federal prosecutors that are going into federal court to

12    push forward this case, I believe they should meet their

13    burden, and I believe at least under New Mexico versus Day they

14    have not met their burden, and given that they have not met

15    their burden, Your Honor, I would respectfully ask this Court

16    not allow Ms. Drez to testify that within a degree of

17    scientific certainty, that his blood alcohol was between .08

18    and .09.

19          Now, Your Honor, I don't want to talk about my

20    proposed expert, but he's going to come in federal court, he's

21    going to testify -- and I provided his report to this Court and

22    also to the prosecution -- he's going to testify what he

23    believes what the blood-alcohol level might have been, and he

24    will be subjected to cross-examination as well.

25          But again, just getting back to this decision, I

1    don't believe the United States has met their burden, Your

2    Honor, and I'd respectfully request that Ms. Drez not be

3    allowed to testify under these facts, that Mr. Tsosie's

4    blood-alcohol level was between .08 and .09, Your Honor.

5            And just, again, to tie this together, she set forth

6    in her report, and I asked her several times, that his blood

7    alcohol was no lower, and most probably higher than .071.  She

8    said that on July 1st.  She has indicated that, as well, in her

9    April 14th, 2011, report, that if one accepts the undeniable

10   conclusion of BAC of .07, taken within one hour of the crash.

11   We have no idea when the blood sample was taken.

12           If the blood sample was taken, and Mr. Baker got her

13   to acknowledge that because it's important for medical staff to

14   prescribe the proper medication, that we can -- I think we can

15   make the assumption that that blood alcohol sample might have

16   been taken as soon as he got there.  If that's the case, then

17   Ms. Drez has indicated that the blood-alcohol level could be

18   .07, and that's within one hour of the crash.

19           Mr. Baker did a good job on direct examination with

20   regard to the issues of impairment, with regard to .02.

21   Whether a person could be impaired if they're at .02, if

22   they're between .06 and .07, he's going to be able to make that

23   argument, and I know he will.  Both he and Mr. Nayback will

24   make an argument to the jury that my client was impaired.

25           They've used the issue with regard to drowsiness, as

1  well.  They'll be able to make those arguments, and they will

2  make those arguments even if this Court should agree with this.

3         And I've spoken to my client.  We're prepared to

4  stipulate that his blood alcohol was .07 when that blood score

5  was drawn at the hospital and at the time of the crash, Your

6  Honor.

7         Thank you.

8         THE COURT:  All right.  Thank you, Mr. Winder.

9         MR. BAKER:  Your Honor, can I make one brief point?

10        THE COURT:  You may.

11        MR. BAKER:  If the defense is going to stipulate to

12  the .07 blood draw, any issue regarding the reliability of the

13  test, the blood draw, when it was done exactly, those types of

14  things falls by the wayside, because, again, if you have a

15  stipulation that at 6:15 defendant's at a .07, then we have no

16  longer even an assumption based on Gayla Bias's testimony at

17  that point.  You have a stipulated fact by the defense.  And so

18  that just adds a level of firmness to the analysis that

19  Ms. Drez did.

20        We think it's fully supportable based on her

21  communications with Gayla Bias and the documentation of when

22  the heplock was done, but given the stipulation that was just

23  acknowledged by the defense, that's one less assumption that

24  even goes into this analysis.

25        I just thought I'd make that point briefly for the

1   Court.

2           THE COURT:  All right.  Anything further, Mr. Winder?

3           MR. WINDER:  Your Honor, the point if we stipulate to

4   this, I'm not suggesting, by any stretch, that we will not

5   cross-examine the Fort Defiance Hospital with regard to the

6   procedures and protocol.  I'm just letting the Court know that

7   it appears as if Ms. Drez has indicated that the blood-alcohol

8   level could not have been lower than .07, and I'll proffer to

9   the Court that Dr. Reyes will testify that the blood-alcohol

10  level was .066.  So that's the reason why we would be inclined

11  to, but, Your Honor -- I don't think I have anything further to

12  say, Your Honor.  Thank you.

13          THE COURT:  All right.  Thank you, Mr. Winder.

14          Well, let me take that under advisement and study the

15  Day case a little bit.  We kind of switched gears from where we

16  started this morning.  I think we've figured out what the

17  issues are, but it looks more like a relevancy issue, listening

18  to you at the end of day, so let me give that some thought.

19          When are we going to get back together?  Did y'all

20  have a chance to talk to Ms. Wild or make a determination about

21  those dates?  Did those dates work for you, May 23rd and 4th?

22          MR. WINDER:  Your Honor, I spoke with my proposed

23  expert, and he's going to be in trial both of those days,

24  May 23rd and 24th, so what I was going to do is to find out

25  when -- what other dates might be available.  And I'll call him

1  tonight and check with him.  But, unfortunately, he's not going

2  to be available.  But we've extended an invitation for him to

3  be interviewed by the U.S. Attorney's Office on May 16th, Your

4  Honor.

5          THE COURT:  Okay.  Are those -- Is there anything

6  around that date, Ms. Wild?

7          I guess the 16th, we've got some trials that week.

8          All right.  I'll just wait to hear from you, and then

9  we'll try to set something up.

10          I'll try to get you an opinion and order out on this.

11          Anything else we need to discuss while we're

12  together?  Anything else I can do for you?

13          Mr. Baker?

14          MR. BAKER:  Nothing from the Government, Your Honor.

15          THE COURT:  Mr. Winder.

16          MR. WINDER:  Your Honor, just one issue.  It's not

17  related to the Daubert issues today, but it's directly related

18  to the trial.

19          Your Honor, as a result of the Owens decision --

20  verdict that came down in Santa Fe, I have some concerns with

21  regard to the jury selection process.  I haven't fully thought

22  this through, but I may request questionnaires to the jury with

23  regard to that case.  I'm concerned, Your Honor, about the

24  case, because there are strikingly similar facts in that case

25  and this case, Your Honor.  So I just wanted to bring that to

1    this Court's attention.

2              THE COURT:  Well, Ms. Wild can talk to you a little

3    bit about the lead time we need for questionnaires.

4              What is it?  How long -- Six weeks, at least.

5              MR. WINDER:  Okay.

6              THE COURT:  So I encourage you to move quickly on

7    that, because at some point -- at some point we can't do them

8    and stick with our trial date.  So I guess the first thing I do

9    is to make a decision on whether you want questionnaires, get

10   the questionnaire drafted up and get it to Mr. Baker and see if

11   y'all have agreement.  If you don't, let's get back in here and

12   discuss that, or, otherwise, we're going to run into problems

13   with the trial date.

14             MR. WINDER:  Thank you, Your Honor.

15             I have not tried a case in front of you in three

16   years or so.  If you could remind me.  You conduct most of the

17   voir dire, correct?

18             THE COURT:  Well, I probably give more voir dire than

19   any of my colleagues, so -- but I do a fairly extensive voir

20   dire, but I might not be going, necessarily, into the questions

21   that -- such as that.

22             You know, unless y'all wanted me to be the one to

23   conduct it, I would probably leave that to the attorneys.  But

24   I do a fair amount of voir dire.  Primarily, you know, there's

25   some basic stuff we've all got to find out about the jury, and

1   I try to take care of that, but I'm primarily trying to make

2   the jury feel comfortable so that when the attorneys stand up,

3   you know, they're not intimidated by the courtroom, they're not

4   afraid to answer.  So I figure that's the most useful thing I

5   can do for the attorneys, is make sure the jurors are

6   comfortable before y'all stand up.  So I try to get it to that

7   point.

8            MR. WINDER:  Thank you, Your Honor.

9            THE COURT:  So just keep that deadline in mind.

10           MR. WINDER:  Thank you.

11           THE COURT:  How about the 26th or 27th?  Do you know

12  if those dates would be available?

13           MR. WINDER:  I will need to call him, Your Honor.  As

14  soon as I get in touch with him --

15           THE COURT:  All right.  Those are a couple of dates

16  that may be available to you, as well.

17           MR. BAKER:  Your Honor, may I address one

18  housekeeping matter?

19           THE COURT:  Yes.

20           MR. BAKER:  I normally like to keep the documents

21  clean in terms of pending motions.  Given the discussion

22  regarding the relevance question, I wouldn't be planning to

23  file a response brief to that motion unless Mr. Winder --

24  unless I misunderstood what he said.  I think that motion's now

25  essentially withdrawn or moot.

1          THE COURT:  Well, I mean, it's kind of evolved.  I'm

2   not sure it's -- I'm not sure it's really moot.  It's just kind

3   of evolved to, instead of it being legally irrelevant, you

4   haven't met the standards for Day.

5          MR. BAKER:  Right.

6          THE COURT:  I guess -- I guess if you were planning

7   on filing a written response I'd still plan on it.

8          MR. BAKER:  Okay.

9          THE COURT:  Because I'm going to have to rule on this

10  somehow.

11          MR. BAKER:  Right.  I figured that you'd rule on the

12  Daubert question.  It's just that -- So there was the request

13  for the Daubert hearing, which I thought triggered the 702

14  analysis, and there's the separate motion that raised just this

15  relevance question.  I could be wrong.  I'm not trying to make

16  it complicated.

17          THE COURT:  Yes.  I thought -- The way I started the

18  opinion on this is, I started, it came before the Court on the

19  notice of intent to introduce expert witness testimony --

20          MR. BAKER:  Okay.

21          THE COURT:  -- which was yours, and then the

22  defendant's motion in limine for a Daubert ruling regarding the

23  admissibility and scope of her expert testimony.

24          MR. BAKER:  Okay.

25          THE COURT:  I think that's all still alive.  Isn't

1   it?

2               MR. WINDER:  I think so.

3               MR. BAKER:  Okay.

4               THE COURT:  It's evolved a little bit, but I guess

5   what I would think, if you were planning on preparing a

6   response, I'd go ahead and do it.  Does that make sense to you?

7               MR. WINDER:  Yes, Your Honor.  I would also request

8   the studies that Ms. Drez made reference to in regard to

9   medications, if that could be made available to us.

10              THE COURT:  Any objection to producing those?

11              MR. BAKER:  We have no problem making best efforts to

12  get what she's got available to her.  I just don't want to

13  suggest that I know what inventory she has, but I'll have her

14  look and see what she looked at and pass it along.

15              THE COURT:  All right.  If there's a problem with

16  that, y'all can reapproach the Court.

17              Anything else?

18              MR. BAKER:  No, Your Honor.

19              THE COURT:  Anything else, Mr. Winder?

20              MR. WINDER:  No, Your Honor.

21              THE COURT:  All right.  Well, appreciate your

22  assistance today and your hard work.  I also appreciate your

23  patience with the Court's scheduling today.  I appreciate you

24  allowing me to make that funeral.

25              MR. WINDER:  I'm sorry for the loss.

1          THE COURT:  He was a good friend.  He was 95, but he

2    fell on Easter Sunday going to church and didn't make it past

3    Monday.  That's a pretty full life, isn't it?

4          MR. WINDER:  Yes.

5          THE COURT:  All right.  Y'all have a good evening.

6       (Court stood in recess at 4:43 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          I N D E X

2          EXAMINATION                                    PAGE

3     GOVERNMENT WITNESS:  NANCY DREZ

4          Direct Examination by Mr. Baker            14
           Cross-Examination by Mr. Winder            47
5          Redirect Examination by Mr. Baker         103

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C-E-R-T-I-F-I-C-A-T E

2    UNITED STATES OF AMERICA

3    DISTRICT OF NEW MEXICO

4

5        I, Danna Schutte Everett, RPR, CCR, CRR, Official

6    Court Reporter for the State of New Mexico, do hereby

7    certify that the foregoing pages constitute a true

8    transcript of proceedings had before the said Court held

9    in the City of Albuquerque, New Mexico, in the matter

10   therein stated.

11       In testimony whereof, I have hereunto set my hand on

12   this 24th day of May, 2011.

13

14                   _____
                     DANNA SCHUTTE EVERETT
15                   Registered Professional Reporter
                     Registered Merit Reporter
16                   Certified Realtime Reporter
                     NM Certified Court Reporter #139
17                   333 Lomas Boulevard, Northwest
                     Albuquerque, New Mexico  87102
18                   Phone:  (505) 348-2283
                     Fax:  (505) 348-2285
19

20

21

22

23

24   April 28, 2011, USA vs. Tsosie

25